S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**JANE SHOEMAKER**
Assistant United States Attorney
Jane.Shoemaker@usdoj.gov
**HANNAH HORSLEY**
Assistant United States Attorney
Hannah.Horsley@usdoj.gov
**GEOFFREY BARROW**
Assistant United States Attorney
Geoffrey.Barrow@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
Telephone: (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:12-CR-00431-01-HA** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **DAVID JOSEPH PEDERSEN,** **a/k/a "JOEY" PEDERSEN,** | **Sentencing: August 4, 2014 at 9:30 a.m.** |
| **Defendant.** | |

The United States of America, by S. Amanda Marshall, United States Attorney for the

District of Oregon, and Jane Shoemaker, Hannah Horsley, and Geoffrey Barrow, Assistant

United States Attorneys, submits the following sentencing memorandum for the Court's

consideration.

## I.     INTRODUCTION

On April 23, 2014, defendant David Joseph "Joey" Pedersen pled guilty to two counts of

carjacking resulting in death, in violation of Title 18, United States Code, Section 2119(3):  (1)

the carjacking and murder of Cody Faye Myers as charged in Count 11 of the indictment; and (2)
the carjacking and murder of Reginald Alan Clark, as charged in Count 1 of a Superseding
Information.[1]  Defendant pled guilty pursuant to a binding plea agreement under Federal Rule of
Criminal Procedure 11(c)(1)(C), which is interlocking with and contingent on defendants Corey
Wyatt and Kimberly Scott Wyatt entering, and the Court accepting, binding plea agreements
with each of them, in Case No. 3:13-CR-271-KI.  Judge King accepted the plea agreement of
Corey Wyatt and imposed the agreed sentence on July 8.  Judge King accepted the plea
agreement of Kimberly Wyatt and imposed the agreed sentence on July 30.  All of the
interlocking contingencies for Mr. Pedersen's plea agreement have been satisfied, and the parties
are ready to proceed to sentencing.

      Defendant Pedersen's plea agreement calls for two life sentences, without possibility of
release, to be served concurrently with one another, and concurrently with the life sentences he is
currently serving for the murders of his father, David Jones "Red" Pedersen, and stepmother,
Leslie Mae "Dee Dee" Pedersen, in Snohomish County, Washington Case No. 11-1-02284-1.  In
exchange, the government agreed to dismiss the other counts in the indictment and strike the
Notice of Special Findings, and the District Attorneys for Lincoln County, Oregon, and
Humboldt County, California, agreed not to pursue additional charges against defendant relating
to this case.  The government also agreed to file a motion to terminate defendant's supervised
release in Case Nos. 11-CR-60092-001-AA and 01-CR-30102-003-AA.  Sentencing is set for
August 4, 2014.

      A presentence report (PSR) has been completed.  The government agrees with the facts
and guideline calculation in the PSR.  The advisory guideline range is consistent with that set

---

[1]  Defendant waived indictment and venue at his change of plea proceeding.

forth in the parties' plea agreement.  If the Court adopts the guideline and criminal history

calculations set forth in the PSR, the final offense level should be level 42 in Criminal History

Category VI, for a guideline range of 360-life.[2]  The parties have agreed that a life sentence,

without possibility of release, is the appropriate disposition in this case.  The parties further agree

that the sentences should be served concurrently with one another and with the life sentences

defendant is currently serving.  The U.S. Probation Office agrees.  Because this case involves an

interlocking "binding" plea agreement under Rule 11(c)(1)(C), the Court must sentence

defendant to life in prison, or reject the plea agreement, in which case none of the parties will be

bound by its terms, and the government will not be bound by its agreements with Corey Wyatt

and Kimberly Scott Wyatt in Case No. 3:13-CR-271-KI.

## II.      FACTS AND PROCEDURAL HISTORY

Joey Pedersen is a long-time white supremacist, and one of the founders of a white

supremacist prison gang known as the "Aryan Soldiers."  Pedersen and Grigsby have each made

multiple statements about their offense conduct.  In approximately June 2011, Pedersen met co-

defendant Holly Ann Grigsby, also a long-time white supremacist, and they connected

immediately.  Pedersen told Grigsby about his desire to start a "revolution" with a mass killing

spree targeting Jewish leaders and "Zionists," to preserve what they perceive as dying American

culture and the white race.  Pedersen also talked about wanting to kill his father for being a child

molester.  Grigsby agreed Pedersen's father deserved to die and discussed other people she

wanted to kill.

---

[2]  This range is wholly independent of defendant's two murder convictions in Washington.
Those convictions were not scored due to their relationship to this case, notwithstanding that the
instant convictions involved two separate and distinct murders and the charges did not
encompass the Washington murders.

Over the weekend of July 4, 2011, Pedersen and Grigsby went camping on the Oregon coast with two former inmates Pedersen had met in prison – Bryce Woods and Corey Wyatt – and Wyatt's fiancé, now wife, Kimberly Scott Wyatt.  After that trip, Corey Wyatt had Kimberly Scott Wyatt – who was the only non-felon in the group – buy a gun for Pedersen to use to commit robberies in order to acquire firearms and money for the revolution, and to move the Wyatts to Portland.  On August 12, 2011, Kimberly Scott Wyatt purchased a 9mm Hi Point C-9 pistol, serial number P1577584, and shortly thereafter Corey Wyatt gave the gun to Pedersen.

On September 8, 2011, Pedersen planned to rob a coffee shop in Portland with Woods, using the gun that Wyatt had given him.  While they were waiting for customers to leave, Pedersen saw a man walking with keys in his hand towards a car parked in a dark area across the street, and decided they should steal his car for other robberies.  When several people intervened, however, Pedersen and Woods fled.  The police stopped the pair while they were running, but ultimately let them go.  Afterwards, Pedersen was worried that the police had seen him with Woods, and he feared his parole would be revoked for associating with a known felon.  Pedersen did not want to go back to prison, and he decided to go off the grid to pursue his destiny and start his revolution.  Grigsby quit her job and joined him.

Pedersen and Grigsby first went to Washington to rob Pedersen's father of guns and money, and to "take care of" his father for being a child molester.  The Wyatts took Pedersen and Grigsby to a Greyhound bus depot because neither had a vehicle.  Joey Pedersen took the 9mm Hi-Point pistol with him that Corey Wyatt had given him several weeks earlier.

The Oregon Department of Corrections intercepted a letter dated September 20, 2011, from Grigsby to Alan Watkins, a co-founder of the Aryan Soldiers, postmarked in Seattle on September 27, 2011, that stated in pertinent part:

Government's Sentencing Memorandum                                                    Page 4

Hailsa brother!  How goes the fight on your side of the cage?  It's spicing up on this side, for me anyway.

Anyhate, my name is Holly, im (sic) a like minded 24 year old.  Ive (sic) been putting in work for what I love since I was 13.  I'm Joey's ole' lady and being the comrade he is, he wanted to get you some under the door love so here I am.  Ive (sic) done four years myself so I understand how just a few lines can make or break a motherfucker whole day.

Not sure how often I will be able to write because I will not be in one spot too long, the call has come and I can't wait to see what the Gods have in store for me.  I will write as often as I can and if you so choose to respond, I will pick up those responses as often as is safe.  …  Maybe when we meet up in the hall of the slain we can swap some art over some mead.  Look forward to hearing from you some how (sic) and if racial preservation calls for my death before we get to know each other, then I will see you at our ultimate destination.  Stride With Pride

"Stride With Pride" is white supremacist code for Supreme White Power.

Pedersen and Grigsby stayed with Red and Dee Dee Pedersen in Washington for several days.  During their stay they planned how Joey Pedersen would carry out Red Pedersen's murder.

On September 26, 2011, Joey Pedersen and Grigsby lured Red Pedersen to a remote area near Everett, Washington, under the guise that he would be taking them to the bus station and they wanted to take a detour to look at possible campsites.  Joey Pedersen shot Red Pedersen in the back of the head with the 9mm pistol that Wyatt had given him, while Red Pedersen was driving his black Jeep Patriot in a remote area.  Grigsby was in the front passenger seat and, according to plan, pulled Red Pedersen's body sufficiently out of the way for her to climb over him and take control of the vehicle without crashing.  Red Pedersen moaned and moved for up to 30 minutes or longer, while they drove around until Red Pedersen finally died.  They covered his body with clothes, and went to several businesses where they made purchases with Red's and Dee Dee Pedersen's joint credit card, including clothing for Grigsby to change into.

The defendants returned to Red and Dee Dee Pedersen's residence, and left Red's body in the Jeep. They entered the house and demanded Dee Dee Pedersen's credit cards and pin number from her. Grigsby bound Dee Dee's hands and legs with duct tape, but then untied her legs and told her to move to the bedroom and get on the bed, where she re-bound Dee-Dee's legs. Joey Pedersen asked Grigsby to kill Dee Dee Pedersen because Dee Dee could be a witness, and also because she had stayed with his father. Pedersen could not bring himself to kill Dee Dee. Grigsby told law enforcement that she asked Dee Dee Pedersen why she supported Red Pedersen when she knew that he was a child molester, and when Dee Dee tried to defend Red, Grigsby cut Dee Dee's throat, using two different knives, a Kershaw knife and a Kabar knife, because neither was sharp enough to kill her quickly. Joey Pedersen fed the dog chicken and prescription pills to keep the dog quiet. The defendants bunched up sheets and a pillow around Dee Dee Pedersen's head to keep her blood from spreading, and waited for it to turn dark outside before leaving.[3] A medical examiner later found incised wounds on both sides of Dee Dee Pedersen's neck, including at least one wound that impacted the jugular vein, causing her to bleed to death.

Pedersen and Grigsby left the residence in Red Pedersen's vehicle, with his body still inside. They took Dee Dee Pedersen's credit cards, a check, and several of Red Pedersen's firearms with them. They drove to the Wyatts' residence in Oregon, making numerous stops along the way, where they used Red's and Dee Dee's debit and/or credit cards to obtain cash and

---

[3] Pedersen later claimed that he killed Dee Dee Pedersen, and Grigsby's counsel have also asserted that Joey Pedersen killed her. However, in earlier law enforcement interviews and other statements, both defendants said that Grigsby killed Dee Dee as she confessed. Joey Pedersen has also claimed on multiple occasions that Grigsby acted under duress throughout their crime spree; however, Grigsby has adamantly denied that, and the evidence belies it as well.

make purchases for food and gas. They arrived at Corey Wyatt's residence early on September 27, 2011 to get help disposing of Red Pedersen's body and vehicle.

Corey Wyatt and Kimberly Scott Wyatt led Pedersen and Grigsby by car into a wooded area near Lebanon, Oregon. When they reached a secluded area, Pedersen, Grigsby, and Corey Wyatt transferred Pedersen's and Grigsby's belongings from Red Pedersen's Jeep into the Wyatt's vehicle, then pushed the Jeep over an embankment. The Wyatts then drove Pedersen and Grigsby back to their home and let them stay there for one night.

The next day, the Wyatts drove Pedersen and Grigsby to several stores where they purchased camping goods and other items using Dee Dee Pedersen's credit card. Later that day the Wyatts drove Pedersen and Grigsby to the coast. Along the way, they stopped near Central Park in Corvallis, Oregon, and Grigsby disposed of a backpack containing clothes with Red Pedersen's blood on them, credit cards belonging to Red and Dee Dee Pedersen, a rifle tag and paperwork for a rifle that belonged to Red Pedersen, and a note that said "J Federation of Greater Seattle" and had an address and phone number for the Jewish Federation of Greater Seattle. The Wyatts dropped Pedersen and Grigsby off on the side of the road west of Philomath with their belongings to resume their "revolution."

After camping near the Oregon coast for three nights, Pedersen and Grigsby planned a carjacking so they could continue their mission. They got a ride to Don David Park in Newport on the night of September 30. The following afternoon, on October 1, Grigsby approached Cody Myers, a 19 year old college student who had attended a Jazz Festival in Newport that day, and asked him for a ride. After Myers agreed and Grigsby got in his vehicle, Joey Pedersen got into the rear passenger seat and pulled the same 9mm pistol on Myers. The defendants forced Myers

to drive to the spot where Joey Pedersen and Grigsby had been camping, and told him they were going to take his car.

While the three were out of the vehicle, Joey Pedersen shot Myers twice in the chest, and told Grigsby to get in the car and drive. Pedersen shot at Myers several more times, shooting him once in the back and once in the head, killing him. Pedersen and Grigsby later drove Myers' car to a remote location where they took Myers' wallet and dumped his body in the woods, covering it with a tarp, sleeping bag, and bags of garbage, including wipes they used to clean up after moving Myers' body.

The defendants had originally planned to carry out their revolution in Seattle or Portland. They later decided that it was too risky to stay in the area, and changed their target city to Sacramento, California. On or about October 4, 2011, Pedersen and Grigsby drove to California in Myers' vehicle. By this time, news reports indicated that Pedersen and Grigsby were suspects in the murders and were believed to be driving Myers' vehicle. Joey Pedersen and Grigsby were concerned about being spotted in Myers' car, so they planned another carjacking.

Late that evening, Grigsby approached several people at a WinCo Foods shopping center in Eureka, California, and asked if they would give her and Pedersen a ride. Eventually Reginald Alan Clark agreed to give them a ride in exchange for gas money. After driving up the highway several miles, Pedersen asked Clark to pull over so he could go to the bathroom. When Joey Pedersen came back, he pulled out the 9mm pistol and told Clark to move over and let Grigsby drive. Clark complied. As Grigsby drove back down the highway, Pedersen shot Clark in the head with the 9mm pistol, and Clark died. The defendants then returned to the WinCo parking lot to get their belongings. When they arrived, they realized that Clark's vehicle did not have a permanent license plate and decided that would be more conspicuous than driving Myers'

vehicle.  The defendants then drove Clark's vehicle to a nearby street, covered his body with clothes, and abandoned it.

Pedersen and Grigsby were arrested in Myers' stolen vehicle in the Northern District of California on October 5, 2011, after a California Highway Patrol officer recognized the description of the vehicle.  An officer located multiple guns in the car, including the 9mm Hi-Point pistol that Corey Wyatt had given Pedersen.  Ballistics and DNA testing confirmed that the gun was used to kill Red Pedersen, Cody Myers, and Reginald Clark.  Grigsby was found in possession of a wallet that contained identification of Cody Faye Myers.  Grigsby also had a .22 caliber magazine loaded with five rounds in her pocket, and was found in possession of a folding Kershaw knife.  A Kabar knife was found in the trunk.  Laboratory analysis confirmed the presence of Dee Dee Pedersen's blood on both knives.

The police found Red Pedersen's wallet in Joey Pedersen's rear pocket.  In the wallet, they found a torn-out section of a telephone book that contained the names, addresses and phone numbers for several Jewish organizations in Portland, Oregon, and a hand-written "press release" that Joey Pedersen admitted writing:

> _____ was eliminated because, as _____ of the _____ he was actively working to further Zionist interests here in America, directly threatening the existence of our culture.
>
> May this act serve notice to all Zionist agents here in America and abroad, as well as their traitorous lackeys, that there exists yet a stout-hearted resistance to those forces seeking to destroy our race.  For too long the great warrior soul of the European people has lain dormant, or been spent in misguided endeavors, and we mean to revive it in an attempt to regain what has long been lost: our existence as a homogeneous cultural entity, independent and free of all alien influence.
>
> Sons of the Wolf

/ / /

Government's Sentencing Memorandum                                        Page 9

On October 20, 2011, the *Oregonian* newspaper, located in Portland, Oregon, received a letter that Joey Pedersen sent from the Snohomish County Jail in Everett, Washington.  The letter, dated October 16, 2011, states in part:

> We sought to do our part in the struggle for racial preservation, not in the hopes that it would effect (sic) any great change in itself, but that it would serve as an example for others to follow.  And that maybe the inspiration we provided would compel another Kindred spirit to follow suit, providing yet another example to follow, eventually lighting the spark that turns into the flame of all-out revolution.

Holly Grigsby made similar statements to the media.

On October 7, 2011, the police located Red Pedersen's Jeep on BLM property near Lebanon, Oregon, ten feet over an embankment, with the front end resting on a tree.  Red Pedersen's body was found lying across the front seat area.  He had obviously been shot in the head.  An autopsy revealed that Red Pedersen was shot at near contact to close range behind the right ear, and the bullet was recovered from Red Pedersen's body.  Each defendant made clear that although Joey Pedersen had personal reasons for wanting to kill Red Pedersen, this murder also furthered their overall plan in two respects: it rid the world of a degenerate who was not fit to be white, and it enabled them to get a vehicle, guns, and credit cards to move forward with their mission.

An autopsy confirmed the identification of Myers' body, and revealed that he died from multiple gunshot wounds, including one to the brain, two to the chest, and one to the mid-back. One bullet was recovered.  Ballistics testing revealed that it was fired from the same Hi-Point 9mm firearm recovered from Myers' vehicle following the defendants' arrests.  The autopsy also reflected that Myers' body had been moved after he was murdered.  Two fired cartridge cases

were also found at the Pioneer Mountain Loop site where Pedersen and Grigsby said they camped, and they, too, were forensically linked to the 9mm Hi-Point pistol. Cigarette butts were also found at the campsite, and DNA testing linked them to Grigsby. Pedersen and Grigsby said Myers was killed because they needed his vehicle for the cause and to prevent Myers from calling the police and being a witness. Grigsby referred to the murder as a "casualty of war."

On October 7, 2011, the Eureka, California Police Department received a report that Reginald Alan Clark had been missing since Tuesday, October 4, 2011, and that his vehicle had been located. When the police arrived at the scene, they saw what appeared to be a pool of dried blood under the truck that had leaked through the floor board. They found Clark's body inside the vehicle hidden underneath a mound of clothing. They also recovered a fired casing in the vehicle. An autopsy confirmed that Clark had been shot in the back of the head with a single bullet. The medical examiner recovered the bullet from Clark's skull, but it was too damaged for ballistics testing. Forensic testing of the casing, however, confirmed that it was shot from the same 9 mm Hi-point pistol recovered from Cody Myers' vehicle following the defendants' arrests. Fingerprints, DNA evidence, and other items seized from Clark's truck and elsewhere link Pedersen and Grigsby to Clark's kidnapping, robbery, and murder. Pedersen described this murder as killing two birds with one stone, because they got rid of a witness and killed a "Negro degenerate" whom Pedersen assumed was a homeless drug user. Clark was African-American.

The defendants were initially charged with the aggravated murders of Red and Dee Dee Pedersen in Snohomish County, Washington, Case No. 11-1-02284. Pedersen pled guilty and was sentenced to consecutive life terms of imprisonment, one without the possibility of parole, in

March 2012.  While the charges were still pending against Grigsby, a federal grand jury returned

an indictment charging Pedersen and Grigsby with racketeering and other offenses encompassing

their entire crime spree, including all four murders.  The Prosecuting Attorney for Snohomish

County dismissed their charges against Grigsby in favor of federal prosecution and both

defendants were brought to Oregon.

After the Attorney General announced his decision not to seek the death penalty against

either defendant, Grigsby pled guilty to the RICO Count, encompassing all four murders, and

Pedersen later pled guilty to the carjackings resulting in the murders of Cody Myers and

Reginald Clark.  This Court sentenced Grigsby to life in prison, without possibility of release,

pursuant to her Rule 11(c)(1)(C) plea agreement on July 15.

## III.   SENTENCING CONSIDERATIONS

### A.    Legal Background

Although the sentencing guidelines are now advisory, *United States v. Booker*, 543 U.S.

220 (2005), they still serve as the starting point and initial benchmark in all sentencing

proceedings.  *Peugh v. United States*, ___ U.S. ___, 133 S. Ct. 2072, 2080 (2013); *Gall v. United

States*, 552 U.S. 38, 49 (2007).  They are a statutory factor that sentencing courts must consider

when imposing a sentence, *see* 18 U.S.C. §3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-

48 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s

objectives."  *Rita*, 551 U.S. at 350.  Thus, when a sentencing judge's "discretionary decision

accords with the Commission's view of the appropriate application of § 3553(a) in the mine run

of cases, it is probable that the sentence is reasonable." *Id*. at 351. In short, sentencing decisions remain "anchored" by the guidelines. *Peugh,* 133 S. Ct. at 2083.

While the guidelines remain "the lodestone of sentencing," and "cabin the exercise" of a sentencing court's discretion, *id*. at 2084, the Court must also consider all the factors under 18 U.S.C. § 3553(a), including the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. §§3553(a)(1)-(2). Other factors include the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense, 18 U.S.C. §3553(a)(7). *See also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow. The Court must first correctly determine the applicable guideline range. *Id*. at 991. The Court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the §3553(a) factors to decide if they support the sentence suggested by the parties." *Id*. The Court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id*. The Court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id*. at 991-92.

Government's Sentencing Memorandum                                          Page 13

**B.        The Appropriate Sentence in This Case**

In light of all of the facts and circumstances of this case, the parties jointly recommend that the Court sentence defendant to life in prison, without the possibility of release, on each count, to be served concurrently with one another and with the life sentences defendant is currently serving for his murder convictions out of Snohomish County, Washington.  The United States Probation Office joins in that recommendation.  The recommendation is within the applicable sentencing guideline range, and the only sentence that will adequately accomplish the sentencing goals under 18 U.S.C. § 3553(a).

Fueled by hatred and his long-standing white supremacist beliefs, Pedersen embarked on a shockingly serious and destructive scheme that ultimately resulted in the murders of four innocent people in the course of just ten days, and well might have resulted in countless other murders if the defendants had not been apprehended before reaching Sacramento, where they planned a mass killing spree.  These murders have caused great anguish for all of the victims' families.  Defendant Pedersen was the driving force and played a critical role in the scheme, including the planning and execution of the crimes, and personally murdering at least three of the four victims.  Pedersen was also likely responsible for recruiting co-defendant Grigsby to participate in the scheme, and caused the Wyatts to become accessories after the fact and engage in other criminal activity to further his mission.

Pedersen was also on post-prison supervision and federal supervised release, and committed these horrendous crimes only months after being released from years in prison.  He already had a lengthy criminal history with multiple convictions for serious crimes of violence,

including robberies, assaults on law enforcement officers, and threats to a federal judge and state prosecutors. Pedersen has not expressed any remorse for all of the destruction he and Grigsby caused. He deserves a severe punishment that is commensurate with the seriousness of these crimes, and needs to be incapacitated in order to protect others who could be the objects of his intolerance and dangerousness. A severe penalty will also hopefully send the message to others that they may not act violently and harm others in the name of their beliefs. A life sentence cannot un-do the damage, but will bring some sense of justice to the victims and society for these horrific crimes.

Based on the above, the government urges the Court to accept the plea agreement and sentence defendant to life in prison, without the possibility of release, as to each count. Life in prison is the only reasonable sentence, taking into account all of the factors under 18 U.S.C. § 3553(a).

> ### C.      Fines, Restitution, and Forfeiture

The government does not recommend any fine, and forfeiture is not in issue.

Restitution is mandatory under 18 U.S.C. § 3663A. None of the victims have submitted any restitution claims to date, however they may still submit claims. The government will notify the defense and the Court if any restitution claims are submitted prior to sentencing. The Court may also order restitution later if claims are submitted within 90 days of sentencing. 18 U.S.C. § 3664(d)(5).

## IV.   APPEAL

Defendant's plea agreement contains a standard waiver of appeal.

V.    **CONCLUSION AND SENTENCING RECOMMENDATION**

The guideline calculations in the presentence report are correct. Defendant's total offense level is 42, his criminal history category is VI, and his advisory guideline range is 360-life. For the reasons set forth above, the Court should accept the binding plea agreement and sentence defendant to life in prison, without possibility of release. Consistent with its plea agreement, the government further recommends that the sentences run concurrent with each other and with the life sentences defendant is already serving for the murders of Red and Dee Dee Pedersen.

DATED this 30th day of July 2014.

Respectfully submitted,

**S. AMANDA MARSHALL**
United States Attorney


*/s/ Jane Shoemaker*
JANE SHOEMAKER
Assistant United States Attorney


*/s/ Hannah Horsley*
HANNAH HORSLEY
Assistant United States Attorney


*/s/ Geoffrey Barrow*
GEOFFREY BARROW
Assistant United States Attorney