UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

       v.                            Case No. 3:12-cr-00431-HA

DAVID JOSEPH PEDERSEN and        AMENDED SUPERVISORY OPINION
HOLLY ANN GRIGSBY;

      Defendants.

_____

HAGGERTY, District Judge:

      Defendants David Joseph Pedersen (Pedersen) and Holly Ann Grigsby (Grigsby) were

charged in a fifteen count Indictment.  Defendants were charged in Count One with

Racketeering, in violation of 18 U.S.C. § 1962(c); in Count Two with participating in a

Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy, in violation of 18

U.S.C. § 1962(d); and the remaining thirteen counts relate to acts of violence, use and possession

PAGE 1 - AMENDED SUPERVISORY OPINION

of firearms, and other criminal activity committed in Washington, Oregon, and California, from September 26, 2011 through October 5, 2011. The indictment in this case includes a Notice of Special Findings regarding five counts that could have formed the basis for a death penalty prosecution. On February 7, 2014, following a number of revelations concerning discovery violations and the interception of defendants' privileged communications, the government filed notice that it would not seek the death penalty against either defendant.

On March 11, 2014, Grigsby pleaded guilty to Count One of the indictment. On April 23, 2014, Pedersen pleaded guilty to Count Eleven of the indictment, carjacking resulting in the death of Cody Faye Meyers, and Count One of the Superseding Information [430], carjacking resulting in the death of Reginald Alan Clark. Both defendants' plea agreements call for sentences of life without the possibility of release and both defendants have been sentenced accordingly. Prior to the entry of their guilty pleas, both defendants had made oral motions for a finding that the government had acted in bad faith. From April 7, 2014 through April 10, 2014, this court held a four-day evidentiary hearing concerning defendants' allegations. Briefing from the government and from Pedersen's counsel regarding the issue of bad faith was due on April 25, 2014. However, both defendants' plea agreements required them to withdraw their requests for a finding of bad faith, and that briefing was never submitted. This Supervisory Opinion now issues pursuant to the court's supervisory powers to address some of the issues raised during the pendency of this case.

**BACKGROUND**

As an initial matter, the court notes that the plea agreements reached by both defendants result in an appropriate resolution to this case. Nothing that follows should be interpreted to

PAGE 2 - AMENDED SUPERVISORY OPINION

suggest that the charges pleaded to, or the sentences imposed, are in anyway inappropriate for the crimes committed. Additionally, there is no evidence that either defendants' guilty plea was unfairly influenced by the government's conduct in this case. Rather, both defendants made intelligent and voluntary pleas of guilty while using the government's conduct as leverage to secure favorable plea agreements.

However, this case was mishandled by the prosecution team and Filter Team One, very nearly jeopardizing this case altogether. During the relevant period, the core prosecution team included two Assistant United States Attorneys ("AUSA1 and AUSA2")[1], staff at the United States Attorneys Office (USAO), Oregon State Police (OSP) Detective Dave Steele and an OSP analyst ("Analyst 1"), a captain from the Oregon Department of Corrections ("ODOC Captain"), and agents at the Federal Bureau of Investigation (FBI). Filter Team One was comprised of one AUSA ("AUSAF"), an FBI agent ("Agent F"), and an OSP analyst ("Analyst F").[2]

The most egregious misconduct was committed by Detective Steele. He was directly responsible for destroying and withholding *Brady* material, failing to catalog and turn over discovery, backdating evidence reports, lying to the USAO regarding this conduct, intercepting and listening to privileged defense communications, and filing a false declaration with this

---

[1] Because this Supervisory Opinion is intended as a preventative rather than punitive measure, the court is utilizing pseudonyms to identify many of the governmental actors involved.

[2] AUSA Scott Asphaug was initially assigned to Filter Team One as the second AUSA, however, AUSA Asphaug never performed any tasks for Filter Team One and his primary involvement in this case was through his role heading Filter Team Two. The court has already found that Filter Team Two acted in good faith in carrying out what the court can only imagine was a very difficult task.

PAGE 3 - AMENDED SUPERVISORY OPINION

court.[3] That said, the problems in this case were not limited to Detective Steele or OSP.

Whether the acts and omissions of the other members of the prosecution team and Filter Team One were made in "bad faith" is no longer an issue before this court. Whether those acts and omissions prejudiced defendants' trial preparation is also no longer an issue before this court, and the court is satisfied that both defendants made knowing and voluntary guilty pleas while aware of the conduct at issue. However, the testimony adduced during the evidentiary hearing and the arguments made at that hearing suggest to the court that the USAO does not understand how this case was mishandled. Without such an understanding, the court does not believe these issues should remain unaddressed. Some of the government's transgressions can be viewed as aberrational and unlikely to be repeated, however, much of its conduct appears to have stemmed from systemic problems and is likely to recur absent corrective action. *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991) (noting that a court's supervisory powers "may be exercised for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct"). Additionally, the court does not believe that it can, in good conscience, allow the government's conduct to pass without comment.

> When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition.

*United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., *et al.*,

---

[3] Detective Steele invoked his Fifth Amendment rights and chose not to testify at the evidentiary hearing. [414].

PAGE 4 - AMENDED SUPERVISORY OPINION

dissenting from denial of rehearing *en banc*).

The conduct at issue can generally be placed into two categories: (1) issues concerning discovery and (2) issues concerning interference with defendants' attorney-client privilege and Sixth Amendment rights.  While the two categories are not mutually exclusive, the division is useful and the facts relevant to each category will be set forth separately.  The court first provides an overview of the factual background as it relates to the discovery violations and then as it pertains to the Sixth Amendment violations.  Both violations also implicate defendants' Fourteenth Amendment due process rights.  The court will then discuss those violations as well as suggested remedial measures to ensure that they do not recur.

The timeline of events laid out below is not strictly linear.  One of the most serious problems in this case is that the government did not notify the court regarding the mistakes and misconduct at issue.  As a result, what initially appeared to the court to be only hiccups turned out to be much larger problems.  The seriousness of those problems was largely concealed until the fall of 2013, when the defense discovered privileged telephone calls in discovery and the government produced Volume 31 of discovery which contained pre-indictment material that should have been disclosed much earlier.  Not until the evidentiary hearing did the full scope of the problems come into focus.  In order to convey the issues as they were presented to the court, it is sometimes necessary to move backwards and forwards in time.

I.      **Discovery Violations**

The provision of discovery in this case was incomplete and untimely.  Perhaps more importantly, the prosecution did not make a concerted effort to notify the court or defendants regarding the pervasive discovery problems until late in the case.

PAGE 5 - AMENDED SUPERVISORY OPINION

A.    Overview of Death Penalty Protocol

The indictment in this case was entered on August 16, 2012.  Until February 7, 2014, when the government announced that it would not seek death against either defendant, this case was treated as a death penalty case.  The deliberative process by which the government determines whether pursuing the death penalty is appropriate is known as the Death Penalty Protocol (DPP) and it is governed by guidelines in the U.S. Attorney's Manual (USAM). Pursuant to the DPP, the United States Attorney for the relevant district submits a death penalty evaluation form and memorandum to the Attorney General of the United States setting forth the United States Attorney's recommendations regarding the propriety of the death penalty in a particular case.  The USAM provides that the United States Attorney "shall give counsel for the defendant a reasonable opportunity to present any facts, including mitigating factors, for the consideration of the United States Attorney."  USAM § 9-10.050.  The mitigation materials submitted by defense counsel are included in the United States Attorney's submission to the Attorney General.  USAM § 9-10.080.  Under the protocol, the United States Attorney's submission to the Attorney General should be made "no fewer than 90 days before the Government is required . . . to file notice that it intends to seek the death penalty."  *Id.*

The materials submitted by the United States Attorney are then reviewed by the Attorney General's Review Committee on Capital Cases, and if the United States Attorney recommends pursuit of the death penalty or a member of the committee requests a conference, defense counsel have the opportunity to "present evidence and argument in mitigation."  USAM § 9-10.120.

B.    Initial Delays

Early in the case there were a number of delays from what appeared to be minor

problems. At the inception of this case, the defense presentations to the United States Attorney were scheduled for May 1, 2013. At a hearing [37] on December 20, 2012, the government indicated that it believed it could produce all discovery, except pending investigation discovery (PID), by February 1, 2013. The court ordered [37] the production of discovery consistent with the government's representations. However, given the relatively ambitious discovery schedule in a case of this magnitude, the court noted that "[i]f the government does not anticipate producing discovery in a timely manner, the government shall request an extension of time in advance of February 1, 2013." On February 1, 2013, the government requested [51] such an extension and suggested March 3, 2013 as a reasonable date for the provision of all discovery except PID. The court granted [54] the government's request and set March 3, 2013 as the discovery deadline. There were no additional requests for an extension of the discovery deadline. The government produced thirteen volumes of discovery prior to the discovery deadline.

In light of discovery delays, the parties agreed to a three month extension in the DPP and the defense presentations to the United States Attorney were moved to August 1, 2013, with the Capital Review Committee scheduled to meet on August 19, 2013. On June 10, 2013, Grigsby requested [95] an additional extension of time due to the effects of funding cuts to the Criminal Justice Act Panel caused by sequestration and because of additional delays in the timely provision of discovery in readily accessible formats. Because of the large number of law enforcement agencies involved, it was apparently difficult to convert electronic discovery into formats that defendants could utilize. The government acknowledged that it had encountered some difficulty in obtaining discovery from law enforcement agencies and did not oppose a limited extension of time, but argued that it had "far exceeded its discovery obligations under

PAGE 7 - AMENDED SUPERVISORY OPINION

Federal Rule of Criminal Procedure 16(a), as well as *Brady*, *Giglio*, and the Jencks Act." Gov't's

Resp. [108] at 5.  Because the parties were unable to agree on a new schedule and because

Pedersen objected to a lengthy continuance, this court denied [117] Grigsby's request with leave

to renew.

Grigsby then filed a renewed motion for an extension of time [121].  Because of the

government's failure to provide accessibly formatted discovery in a timely manner and due to

sequestration's effects on defense preparation, the court granted [140] the requested continuance

over the objections of Pedersen.  The defense presentations to the United States Attorney were

scheduled for November 4, 2013; the defense presentations to the Capital Review Committee

were set for December 9, 2013; and a status conference regarding the Attorney General's

determination was set for February 7, 2014.  The court set July 7, 2014 as the date to begin jury

selection.

On September 27, 2013, Grigsby requested [196] an additional two-month delay in the

schedule.  Oral argument on her motion was held on October 2, 2013.  During oral argument,

counsel for both defendants complained about continued discovery delays.  However, this court

concluded [214] that the November 4, 2013 hearing date would give Grigsby a "reasonable

opportunity to present any facts, including mitigating factors, for the consideration of the United

States Attorney" and denied Grigsby's requested continuance.  USAM § 9-10.050.  At that time,

the court was unaware of the gravity of the discovery problems as the prosecution team had

acknowledged only a fraction of the problems then known to it and had argued that "the DPP has

been delayed long enough . . . defendants have been given far more time and far more discovery

than most defendants receive before the death penalty decision is forwarded to the [Capital

Review Committee] and the Attorney General." Gov't's Resp. [205] at 7.

        C.      Volume 31 of Discovery and Initial Exposure of Serious Problems

On October 9, 2013, Grigsby filed an additional Motion for Extension of Time [216]. That motion came on the heels of the prosecution's production of Volume 31 of discovery, which contains video and audio recordings of five interviews with defendants' family members that were recorded in 2011. These interviews are "death penalty interviews" and take place with a defendant's family members soon after the commission of a murder. The government produced Volume 31 of discovery the day after the October 2, 2013 hearing. At no time during, or prior to the hearing, did the government notify the court or defendants that the additional pre-indictment discovery was forthcoming.

That same discovery, in part, prompted Pedersen to file a Motion to Compel [222], which requested, among other things, additional unproduced evidence that Pedersen believed to be in existence due to the content of Volume 31, including photographs received from Pedersen's family members during the death penalty interviews. Pedersen's Motion to Compel also requested additional unproduced evidence, such as Pedersen's jail calls from the Multnomah County Detention Center (MCDC), none of which had been provided despite the fact that Pedersen had been housed there for approximately one year. Lastly, Pedersen requested the reproduction of some discovery in useable format. The Motion to Compel outlined wide-ranging and pervasive discovery problems in the case beyond the specific items requested.

In opposing Pedersen's Motion to Compel and Grigsby's Motion for Extension of Time, the government filed declarations from both AUSAs on the prosecution team and from Detective Steele, who was at that time, the lead investigator for the prosecution team. The declarations

addressed defendants' broader allegations of discovery violations and the specific facts related to Volume 31 of discovery.

With respect to the broader discovery problems, AUSA2 explained that the government had generally processed discovery promptly upon receiving it, but that processing discovery in this case has been difficult because the crimes charged in the indictment occurred in three states and were investigated by dozens of different law enforcement agencies. Gov't's Decl. [242] at ¶ ¶ 2 and 5. AUSA2 explained that because of ongoing discovery difficulties the USAO sent an email to multiple law enforcement agencies in July 2013 requesting that they "provide the USAO with any index/log/lists of evidence and reports they had in connection with this investigation." *Id.* at ¶ 3. More recently, both AUSAs had directed Susan Cooke, the Supervisory Information Technology Specialist for the Automated Litigation Support unit within the USAO, to conduct a comprehensive audit of the discovery in this case. *Id.* at ¶ 5. As of October 16, 2013, the government had produced thirty-two volumes of regular discovery with over 48,000 files, which included hundreds of hours of audio and video recordings.[4] *Id.* at ¶ 5.

With respect to the discovery already produced, AUSA2 stated that the "USAO maintains a Discovery Log that tracks exactly what was provided to defense counsel, to whom it was provided, the date provided, and a brief description of any notes regarding it." *Id.* at ¶ 6. Additionally, the USAO "maintains a Discovery Index, which tracks each and every item (usually documents or recordings) in discovery including the Bates number, volume, number of pages, and a brief description of the item, as well as other identifying fields." *Id.* at ¶ 7. AUSA2 stated that the Discovery Index covers all thirty two volumes of discovery produced at that time,

---

[4] The government had also produced five volumes of PID at that time.

PAGE 10 - AMENDED SUPERVISORY OPINION

and had been provided to defendants "with each and every production" of discovery. *Id.* at ¶¶ 7-8.

With respect to Volume 31, the AUSAs explained that they were aware that the five death penalty interviews had taken place in 2011, but were unaware until September 18, 2013 that the interviews had not been provided to the USAO and had not been produced in discovery to defendants. Upon learning that the recorded interviews had not been produced, the AUSAs requested that OSP provide them with the interviews immediately. One week later, on September 25, 2013, the AUSAs realized that they still did not have (and had not produced to defendants) the interviews and requested them again. On September 27, 2013, OSP overnighted the interviews to the USAO and on October 3, 2013, the USAO produced them to defendants. The AUSAs stated that they did not think to mention the forthcoming discovery during the hearing on October 2, 2013, because they were focused on the arguments at hand.[5] In hindsight, they state that they should have mentioned the missing discovery to defendants as soon as they became aware that it had not been produced. Gov't Decl. [240] ¶¶ 2-4; Gov't Decl. [242] ¶¶ 16-19.

Detective Steele, for his part, explained that "[t]he recordings and reports of the Death Penalty Interviews done in this case were set aside and maintained separately from the investigatory reports and evidence at OSP." Steele Decl. [236] ¶ 4. Apparently, "[t]his was consistent with [OSP's] normal practice in state death penalty cases." *Id.* According to Detective Steele, the AUSAs had repeatedly asked for all reports and evidence, but "[b]ased on my state

---

[5] During oral argument on October 2, 2013, defense counsel for Grigsby complained about general discovery delays in addition to difficulties in arranging for the review of forensic evidence.

PAGE 11 - AMENDED SUPERVISORY OPINION

death penalty experience at OSP, I understood those requests to apply to the reports and evidence generated through the investigatory process, not the separate death penalty process." *Id.* at ¶ 5. Detective Steele also reported that "[w]e did not obtain any photographs from [Pedersen's sister] or other family members interviewed." *Id.* at ¶ 8.

During oral argument on the Motion to Compel and Motion to Extend Deadlines on October 16, 2013, defense counsel immediately took issue with the veracity of the government's declarations and with the government's characterization of how discovery had been provided in this case. In particular, one of Pedersen's attorneys, Assistant Federal Public Defender (AFPD) C. Renee Manes, argued that less than half of the volumes of discovery were provided with an index and that the indices provided contained relatively little information. In some instances, a single Bates number would contain dozens or hundreds of files and almost no description of the contents. Moreover, only thirteen of the thirty-two volumes of discovery produced at that time were produced in compliance with the court's discovery deadline. The majority of the untimely discovery was not PID. AFPD Manes argued that:

> So to say that somehow the Government has provided these indexes and there's no reason why we can't understand what's going on in their discovery is a complete fallacy. If they had provided such indexes, if they did know what was in their discovery, they would have known that they had attorney-client phone calls of Ms. Grigsby, of Mr. Pedersen, and of their informant.[6] If they had so many indexes, they would not have twice provided to us duplicative Bates number discovery . . . So to believe from [AUSA2's] declaration that somehow the discovery is all well and good, is all being provided to us expeditiously in useable formats and there's no problems, that is just false. It is a false statement.

---

[6] A taint review process was initiated after defense counsel found that numerous privileged defense jail telephone calls had been recorded and provided to the USAO. Some of those telephone calls were produced in discovery in September, 2013. Those issues are discussed below in the court's review of the Sixth Amendment and attorney-client privilege problems.

PAGE 12 - AMENDED SUPERVISORY OPINION

During oral argument, AUSA1 acknowledged the discovery problems but initially stood by the declaration of AUSA2, stating: "We do have the discovery indexes.  We have the detailed – I forget how Ms. Cooke described the difference between – oh, the discovery log versus the detailed discovery index to try to track what discovery is there."  Later, AUSA1 backed away from that statement to a certain degree, stating that she "can't answer now – if the Court needs a further explanation, we can find out from Ms. Cooke further details about those indexes and what the discrepancy is between what Ms. Manes has told the Court about the indexes and what our understanding of those indexes is."  Prior to oral argument, defendants had suggested that they might request a finding that the government had acted in bad faith in accordance with the Ninth Circuit's ruling in *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008).  By the end of oral argument, both defendants requested that this court make a finding that the government had acted in bad faith.  One of Grigsby's attorneys, Kathleen Correll, argued that:

> [I]t seems like the prosecutors' position is that "we need adequate time to do and take certain steps that we need to take, but you, defense, can just keep sucking up the late discovery that we keep giving you and deal with it" . . . they don't even know what they have or the extent of their discovery and what it entails.  And the fact that this stuff has been dealt with – stuff they're dealing with in July, the efforts they're making now are great, but I still don't know – I haven't heard any explanation about why those efforts weren't made . . . when the defendants were arraigned.

AFPD Manes argued that:

> Our position is at some point in time this negligence amounts to bad faith.  If the government had informed us back in March, "We're still having problems getting material.  It's going to roll in slowly.  We just want to make you aware of that," there might have been less bad faith, but that type of representation was never made.  This material was just dropped on us and dropped on us the next time and dropped on us the next time, and never was there an explanation . . . they are not complying with their obligations, they are not complying with the court's order, and the only time they make that acknowledgment is when we file motions and we

PAGE 13 - AMENDED SUPERVISORY OPINION

bring it to the court's attention.

At the conclusion of that hearing the court granted Grigsby's request for an extension of time and ordered that the defense presentations to the United States Attorney be moved from November 4, 2013 to December 9, 2013; that the defense presentations to the Capital Review Committee be moved from December 9, 2013 to a mutually agreeable date in early January 2014; and that all other deadlines remain the same, including the February 7, 2014 status conference. This shortened the time frame during which the Attorney General would be able to consider whether death was appropriate.[7]  Under that resolution, the court was able to provide Grigsby with additional time without causing prejudice to Pedersen, who continued to oppose any further delay in the case schedule.

On October 17, 2013, Pedersen filed a supplemental brief [246] noting that the defense had only received fifteen discovery indices and that they were not the detailed indices outlined in AUSA2's declaration.  Pedersen had requested copies of the indices outlined in AUSA2's declaration, but the government indicated that it would need additional time to provide them, in part because some discovery volumes were inaccessible due to the pending taint review process.

In the declarations attached to the government's response, Cooke and AUSA2 provided clarification regarding what had, and had not, been produced to defendants.  AUSA2 stated that in drafting her previous declaration, she had relied on emails from Cooke regarding the number and content of the indices provided in discovery because Cooke "understands the technological

---

[7]  The court's review of the DPP suggested that the time frame for the Attorney General's decision was not set in stone.  Under the DPP, "[i]f a case is not submitted 90 days in advance of a deadline for the Attorney General's decision . . . the prosecution memorandum should include an explanation of why the submission is untimely."  USAM § 9-10.080.

PAGE 14 - AMENDED SUPERVISORY OPINION

details of the discovery in this case much better than I do." Gov't's Decl. [261] at ¶¶ 2, 4-5.

AUSA2 stated that since filing the October 16, 2013 declaration, "it has come to my attention

that the discovery index for this case is maintained in a variety of different formats, and that the

amount and type of indexing information varies." *Id.* at ¶ 10. "I now realize that the indices for

some discovery volumes have less detailed information than I had seen with other productions

and that I understood we were providing in this case when I prepared my declaration of October

16, 2013." *Id.* Cooke explained that when she provided information to AUSA2 regarding the

nature of the discovery indices it was primarily "to confirm that the government maintains

discovery logs and other indexing materials for this case that can be used to identify what

discovery has or has not been produced." Cooke Decl. [262] at ¶ 3. Cooke further explained that

indices had been provided with nearly all volumes of discovery. *Id.* at ¶ 15. However, Cooke

uses the word "index" quite broadly and interprets it to refer to many types of indexing

information including Excel files, file listings, Adobe indices, and cover letters.[8] *Id.* at ¶¶ 8, 14.

Given this definition of the term "index," it is obvious that "[s]ome volumes of discovery have

indices with more detailed information and some have less." *Id.* at ¶ 9; Tr. 465-66[9] (some Bates

numbers included multiple audio or video files, for example, in one instance a single Bates

number was associated with approximately 8,000 files). Cooke provided defendants with the

USAO's discovery index on October 22, 2013, along with previously produced individual

indices. *Id.* at ¶ 15.

---

[8] Describing a short cover letter as an "index" is, in the court's view, too broad an
application of that term.

[9] "Tr." refers the official transcript of the evidentiary hearing held from April 7, 2014
through April 10, 2014.

PAGE 15 - AMENDED SUPERVISORY OPINION

The court eventually granted [291] Pedersen's Motion to Compel. Along with the response to Pedersen's supplemental brief, the government filed a Motion to Appoint a Magistrate Judge [248] to oversee discovery in the case. That motion was later denied [391] as the court did not want a duplication of judicial efforts or the possibility of inconsistent direction to the prosecution team.

### D.    Initial Revelations of Detective Steele's Misconduct

On December 13, 2013, Cooke was working on the discovery audit in "the cave," a workspace used by OSP personnel on the prosecution team, when she discovered a letter on Detective Steele's desk. The letter, dated November 29, 2011, was from Pedersen's sister and read "Hi Detective Steele, Here are the pictures you requested. I'm sorry it took me so long to get them to you. My main worry is that whomever gets these pictures will use them to paint my brother in a good way . . ." Notice [367] at 5; Ex. 236.[10] In response to this revelation and others, Detective Steele was removed from the prosecution team and was placed on administrative leave. The discovery audit continued and extensive, previously undisclosed evidence, was produced in discovery. Status Report Regarding Gov't's Discovery Audit [366].

### E.    Evidentiary Hearing

The government requested an evidentiary hearing to resolve defendants' requests for a finding of bad faith. During the evidentiary hearing held April 7, 2014 through April 10, 2014, the court gained additional insight into what had occurred in the months leading up to the initial exposure of discovery problems in October 2013 and in the provision of discovery after the

---

[10] If not otherwise specified, the designation "Ex." refers to exhibits received during the evidentiary hearing held from April 7, 2014 through April 10, 2014.

PAGE 16 - AMENDED SUPERVISORY OPINION

comprehensive discovery audit began in October.

At the outset of the case, OSP was supposed to be the central repository for receiving and organizing discovery. Analyst 1, a research analyst at OSP, was responsible for organizing much of the discovery, though she did not handle any actual evidence. Tr. 227-28. Rather, she was supposed to receive and organize all reports regarding evidence. The actual evidence was segregated from the reports at OSP, though it does not appear the AUSAs were aware of this. Tr. 637. The discovery would then be transferred from OSP directly to the AUSAs. Tr. 297. The AUSAs then transferred it to the Automated Litigation Support Unit to process and add Bates numbers. Tr. 297-98. The processed discovery would be returned to the AUSAs and they would provide it to defense counsel. Cooke and her team members on the Automated Litigation Support Unit were responsible for providing technical support but were not tasked with reviewing discovery or ensuring that the USAO was producing legally sufficient discovery. Sometime during the spring of 2013, evidence was transferred from OSP to the FBI, in part due to concerns the AUSAs had regarding organization at OSP. Tr. 315.

Initially, the AUSAs believed that discovery was being provided in accordance with the discovery deadline. AUSA2 testified that "the only things that we thought were still remaining [to be produced] as of March 1st were matters related to our ongoing investigation." Tr. 630. It appears this confusion stemmed from the fact that the AUSAs were not actively reviewing the discovery as it was produced.

The District of Oregon Criminal Discovery Policy states that AUSAs "will gather and

review all case-related reports and evidence." The Federal Criminal Discovery Blue Book,[11]

citing the Ogden Memo, states that "[i]t is 'preferable' but 'not always feasible or necessary' for

prosecutors to review the relevant material to identify discoverable information," and the Ogden

Memo itself suggests that "[t]o ensure that all discovery is disclosed on a timely basis, generally

all potentially discoverable material within the custody or control of the prosecution team should

be reviewed." Tr. 631; Exs. 15 at 2; 350 at 24; 351 at 4. The AUSAs determined that it was

impractical and unnecessary to review all discovery in this case due to the large volume of

discovery involved and because they had taken the position that, as a potential death penalty case,

nearly everything was discoverable and would be produced. Tr. 632-34, 851. As a result of this,

the AUSAs were, to a substantial degree, unaware of what had and had not been produced in

discovery.

In April 2013, after receiving inquiries from defense counsel, AUSA2 asked Cooke to

find the Cody Myers crime scene photographs and Cooke was unable to locate them in discovery.

Tr. 300, 676-77. Cooke found reports related to the photographs but not the actual photographs.

Cooke was not able to find many photographs at all, which she considered "strange." *Id.* As

discussed above, OSP's practice was to segregate evidence from the reports related to the

evidence. Cooke let the AUSAs know she was unable to find the photographs, however, Analyst

1 was able to locate them at OSP. On April 29, 2013, AUSA2 sent a letter to defense counsel

---

[11] The Discovery Blue Book is a publication of the U.S. Department of Justice Office of
Legal Education. It was published in 2011 after prosecutorial misconduct was uncovered in the
corruption trial of Senator Ted Stevens. This court ordered [398] the government to produce it to
the defense over the government's objections pursuant to a protective order. The Ogden Memo
was written by Deputy Attorney General David Ogden and provides guidance to AUSAs
regarding criminal discovery.

PAGE 18 - AMENDED SUPERVISORY OPINION

notifying them that some of the evidence had been segregated from the reports and that it was then being produced.  Tr. 301, 641; Ex. 4.

In response to evident problems in the discovery, Cooke wrote the two prosecution team AUSAs on April 23, 2013 because she was "feeling like someone should be keeping a better list of everything the agencies have vs. what we have vs. what has been discovered.... Is there a way to figure out how to do [sic] manage this?  I'm happy to help but I have no idea what is out there."  Ex. 3 at 21.  The AUSAs agreed that the creation of an index was appropriate and Cooke began creating a comprehensive discovery index.  *Id.*; Tr. 301.

While Cooke was creating the index "it became clear just within a matter of weeks . . . that this was going to be a much more difficult task than we had imagined."  Tr. 303.  The discovery indices provided by OSP were not "comprehensive enough for us to even be able to do this indexing process."  *Id.*  At that time, the AUSAs decided to request all evidence lists, logs, and indices from the approximately twenty-four law enforcement agencies involved in the case. *Id*; Ex. 32.  An email requesting that material was sent from Cooke's email address, but it was signed by both AUSAs in order to convey the seriousness of the request.

In September 2013, the AUSAs asked Cooke if a WinCo video was in discovery (this video was requested in Pedersen's Motion to Compel and includes a recording of Pedersen and Grigsby before and after the murder of Reginald Alan Clark in the parking lot of a WinCo grocery store).  Tr. 307-08.  The video was not in discovery, however, Cooke was able to find it at the FBI.  Tr. 308.  Cooke then determined that discovery from Eureka (where Clark was murdered) had not made it to the USAO, but "had just sat . . . in evidence at FBI."  *Id.*  At approximately the same time, the AUSAs realized that the death penalty interviews had also not

PAGE 19 - AMENDED SUPERVISORY OPINION

been produced in discovery.  Cooke testified that she "was having some bad gut feelings"

regarding the provision of discovery and her testimony depicted a chaotic situation:

> Well it had been sort of a buildup over time from – from the beginning of when
> my unit tried to do an index of material and had such difficulty, through to the fall
> of 2013, when we were still finding that there was material at OSP that we hadn't
> received at FBI.  And, in addition, at that time, defense had filed a motion to
> compel, requesting for [sic] very specific items.  And we felt strongly at that time,
> given all of this sort of uncertainty, and in talking to OSP members, we weren't
> feeling confident we were getting sort of the whole understanding – the whole
> picture of what was going on, and so because of that I – I remember our meeting
> with the AUSAs where we decided to actually sort of create this discovery audit; a
> very formal serious discovery audit.

Tr. 310-11.

Cooke was placed in charge of the discovery audit.  Under the audit, the USAO "would

not be relying on any kind of agency material anymore and doing an independent thorough

comprehensive analysis on our own of what the agencies had and what they should be giving us

and then whether we also got that out in discovery." Tr. 311.  On October 16, 2013, Cooke

provided the prosecution team AUSAs with a memorandum describing in detail the tasks she

would undertake pursuant to the discovery audit.  Once the audit began, the USAO made it a

priority and it became the only case that Cooke worked on.  Cooke spent the first several weeks

of the audit working at the USAO and the FBI before transitioning to OSP in December 2013.

While at OSP, Cooke interviewed Detective Steele, who was still assigned to the case,

regarding his organizational methodology and about particular items of discovery.  During the

interview, he stated that, as the lead investigatory agent, it was his practice not to take any notes.

Tr. 322.  If he did happen to jot down a telephone number or some other note, he would shred the

note. Tr. 323.  He also deleted all of his emails.  *Id.*  When questioned about the Motion to

Compel, Detective Steele denied having any photographs from Pedersen's family members and

shortly thereafter, abruptly terminated the interview. Tr. 324.

Cooke then interviewed Analyst 1 who told Cooke that there had been a persistent

problem with organization in the case. During the evidentiary hearing, Analyst 1 testified that

she was brought onto the case at the very beginning when the defendants had not yet been

apprehended. Tr. 225. She was placed in charge of organizing all reports regarding the

investigation into binders consistent with OSP procedures. Tr. 227-28. After defendants were

arrested in California, Analyst 1 remained on the case and continued to organize all reports

submitted to OSP, which was the lead investigatory agency on the prosecution team. While the

reports from Oregon's law enforcement agencies were submitted on a timely basis, Analyst 1 did

not receive reports from Washington until approximately a year into the case and never received

any reports from California. Tr. 244. Analyst 1 testified that during the case, Detective Steele

was dealing with personal issues and was out of the office on a regular basis. Tr. 239. During

that time, he was not particularly organized, and Analyst 1 had to repeatedly ask Detective Steele

to log some items into evidence. *Id.*; Tr. 680 (AUSA2 testified that by August 2013, the AUSAs

"were concerned that Steele seemed to be only intermittently available and accessible"). Analyst

1 confirmed that it is OSP's practice to keep death penalty interviews separate from other

discovery as "[t]hose come in later during the penalty phase." Tr. 243.

After interviewing Analyst 1 and Detective Steele, Cooke began her audit of the cave.

There were many case-related documents and electronic storage discs on the desks in the cave

and Cooke decided to begin by randomly sampling the materials to determine whether those

items were in the USAO's discovery database. Tr. 328. Cooke's initial sampling found that fifty

PAGE 21 - AMENDED SUPERVISORY OPINION

to seventy percent of the items were not in the database. Tr. 329. The items were disorganized and "worse than that . . . many, many, many of the items had sticky notes, where [Analyst 1] had written a note to Mr. Steele saying something to the effect of, 'We need to get this into evidence.'" *Id.* Cooke also determined that Detecitve Steele had backdated many of the reports he wrote regarding evidence in the case. Tr. 330-31. Cooke also discovered two or three boxes of Detective Steele's notes and a significant volume of jail correspondence and jail calls from defendants that did not appear to have gone through the filter team process. Tr. 331-332, 348. At the direction of AUSA Asphaug, Cooke began to remove anything that might contain attorney-client communications so that it could go through the filter process. Tr. 333. During her search for such material, Cooke found the letter from Pedersen's sister described above. Tr. 335. No photographs were found accompanying the letter. Cooke removed approximately thirty boxes of items containing jail communications from the cave. Tr. 341.

In response to these discoveries, the prosecution team AUSAs removed Detective Steele and Analyst 1 from the prosecution team and notified [327] the court and the defense regarding the discovery of the letter from Pedersen's sister. Additionally, the Salem Police Department initiated an investigation of Detective Steele and during that investigation, found a torn-up evidence receipt for the letter in a shred bin. Tr. 473-74.

After the Salem Police Department had completed its preliminary investigation, Cooke returned to OSP to remove everything related to the case. Tr.344. In Detective Steele's office, Cooke found four bankers boxes with evidence from the Columbia County Jail where Grigsby had been housed. It is unclear if the evidence contained in those four boxes was privileged, but it had not been produced in discovery. Tr. 346. During the audit, Cooke removed between forty-

PAGE 22 - AMENDED SUPERVISORY OPINION

five and fifty boxes of material from the cave and produced it in discovery.  Tr. 346.  A portion

of that material was privileged and until it was removed, had been in the possession of OSP.

Exs. 164, 229, 244 (a twenty-nine part exhibit reflecting the discovery of privileged information

in the cave including multiple discs with attorney-client telephone calls).  Cooke estimates that

most of the material taken from OSP was duplicative of previously produced discovery, but this

was not measured in any sort of systematic fashion.[12]  The only individual to have

comprehensively reviewed all discovery was Brad Dobrinsky, a contract paralegal at the Federal

Public Defender.  In his estimate, ten to twelve percent of the discovery produced was

duplicative.  Tr. 820.  At the time of the evidentiary hearing, the government had produced a total

of ninety-seven volumes of discovery, thirteen of which were produced prior to the discovery

deadline.  Tr. 545.  This discovery came from all three states involved in the investigation.[13]  In

total, Cooke spent approximately 1,700 hours working on the audit beginning in October 2013,

and at the time of the evidentiary hearing, the audit was ongoing.  Tr. 461.

## II.    Sixth Amendment Issues and Attorney-Client Privilege

Prior to and during the pendency of this case, a number of the defendants' privileged legal

communications were intercepted and reviewed by members of the prosecution team and Filter

Team One.  These violations continued for a significant portion of the case in large part because

the organization and provision of discovery was sloppy and untimely and because defense

---

[12] As noted above, Cooke was not tasked with reviewing the substance of the discovery produced.

[13] On April 4, 2014, the government produced, for the first time, an audio recording of Grigsby invoking her right to counsel.  This recording, from October 2011, was found at the Lincoln County District Attorney's office.  Tr. 488-89; Ex. 309.

PAGE 23 - AMENDED SUPERVISORY OPINION

counsel and the court were not notified of the violations when the AUSAs were, or should have

been, aware of them.

Prior to the entry of the Indictment on August 16, 2012, Pedersen and Grigsby were

charged in Washington State with some of the same conduct at issue in this case, specifically the

murders of Pedersen's father and stepmother. Pedersen ultimately resolved those charges through

a plea of guilty to the two murders. The charges against Grigsby were dismissed without

prejudice when she was brought to Oregon to face federal charges. While defendants were in

custody in Washington, the USAO began preparing its case.

A.      Interception of Pedersen's Legal Mail

Following Pedersen's plea in Washington and prior to his arrest in this case, Pedersen was

incarcerated at the Monroe Correctional Complex in Monroe, Washington. While there,

Detective Steele, Analyst 1, and ODOC Captain, all members of the prosecution team, obtained

approximately twenty-six pieces of legal mail between Pedersen; his Washington attorneys,

Gilbert Levy and Donald Wackerman; Theresa McMahill, his mitigation specialist and

investigator in this case and the Washington case; and Richard Wolf, one of his attorneys in this

case. Ex. 223.

In an email dated March 12, 2012, ODOC Captain requests "copies of any mail to or from

[Pedersen and Grigsby] as well as copies of any and all phone calls" from the Washington

Department of Corrections. Ex. 110 at 2. It appears that members of the prosecution team may

have requested legal mail on the theory that Pedersen's communications with members of his

defense team were not protected either because he was using his attorneys to "pass" or "wash"

mail or because there was no open case against him at that time. Exs. 113, 114, 116, 118 and

PAGE 24 - AMENDED SUPERVISORY OPINION

119. The Washington Department of Corrections appears to have provided his legal mail because Pedersen either failed to mark it as such, or more often, because he did not follow Monroe's protocol for the treatment of legal mail whereby an inmate must not only mark legal mail as such, but must also utilize certain procedures for sending legal mail. Exs. 118 and 122; Tr. 165-67. There was no evidence presented that Pedersen received any orientation upon arriving at Monroe or that he was educated regarding these procedures. It also does not appear that any staff member attempted to educate him on the proper procedures for sending confidential legal mail once it was clear he was ignorant of those procedures. As a result, many pieces of his legal mail that were clearly marked as such, were provided to the prosecution team in this case. *See, e.g.*, Exs. 119-23, 223.

The prosecution team AUSAs were unaware that this legal mail was being collected until June 15, 2012. On that date, AUSA2 was copied on an email from ODOC Captain to Detective Steele and Analyst 1 discussing mail that Pedersen sent to Gil Levy. Ex. 145. AUSA2 immediately responded stating "STOP! DO NOT OPEN THE ATTACHMENT AND READ THE LETTER IF YOU HAVE NOT DONE SO ALREADY." *Id.* AUSA2 correctly explained that Levy represented Pedersen on his Washington State case and that reading potentially privileged material could jeopardize their ability to continue working on the case. *Id.* She then requested that ODOC Captain and anybody else who may have read the letter to call her explaining how they received the letter, what they had done with it, and who else may have read it. *Id.* AUSA2 then consulted with the USAO's professional responsibility officer and determined that she should also consult with the Professional Responsibility Advisory Office

PAGE 25 - AMENDED SUPERVISORY OPINION

(PRAO) in Washington, D.C.[14]  In the meantime, AUSA2 instructed members of the prosecution team who had received mail or other communications between a defendant and any member of their defense team that may contain privileged communications to put the communication in a sealed envelope, segregate it from other case materials, write a brief but thorough report regarding each communication received, and to not obtain or disclose any other communications between a defendant and a member of his defense team.  Ex. 3 at 3-4.  AUSA2 then informed members of the prosecution team that she and AUSA1 would work to set up a filter or taint team to handle these types of matters moving forward.  *Id.* at 4.  A taint team was not set up until November 2012.

      B.      Review of McMahill's Communications with Pedersen

During approximately the same time period in the Spring of 2012, law enforcement members of the prosecution team were concerned that McMahill was part of an ongoing criminal conspiracy.  Accordingly, they obtained, listened to, and took notes regarding legal calls between Pedersen and McMahill.  Tr. 694-96, 900-902; Exs. 129, 133.  Analyst 1 created a synopsis of McMahill's communications with Pedersen.  The synopsis includes notes regarding eleven telephone calls between Pedersen and McMahill beginning on October 30, 2011 and continuing until January 12, 2012.  Ex. 133.  In the synopsis, it is evident that McMahill identifies herself as a member of the defense team and states that the calls are privileged.  *Id.*  In fact, the first line of the synopsis reads: "Tess states that she is Joey's 'forensic social worker appointed by the courts to work on his case.'  Tess says she has privilege afforded by his attorneys."  *Id.*  Analyst 1

---

[14] The USAO chose not to rely on any advice provided by PRAO during the evidentiary hearing.  As such, any advice provided by PRAO in response to AUSA2's request or any other in this case is privileged and was not disclosed to the court or the defense.

PAGE 26 - AMENDED SUPERVISORY OPINION

testified that she was instructed by Detective Steele to listen to the McMahill calls and was told

they were not legal because McMahill "was not an official member of the team and that her – her

correspondence and phone calls were not protected." Tr. 252. OSP members of the prosecution

team also received recordings of Pedersen's calls with Wolf and Levy during the same time

period. Exs. 106, 146. The communications synopsis also includes brief summaries of five

letters from Pedersen to McMahill written during March and April of 2012. Ex. 133.

       At a meeting on April 13, 2012, the prosecution team, including both AUSAs, discussed

the law enforcement members' concerns regarding McMahill. Ex. 131. At that meeting, the

prosecution team discussed the fact that McMahill was claiming to be a part of the defense team

and that Lincoln County District Attorney Rob Bovett did not believe McMahill's

communications were privileged because she was misrepresenting herself as a forensic

psychologist. *Id.* During the evidentiary hearing, Bovett testified that he had not offered such an

opinion, but did not believe McMahill's communications were privileged because she was

engaging in "bad conduct." Tr. 114, 119.[15] At some point, Bovett reviewed the communications

synopsis and discussed the matter with the two AUSAs. Tr. 117. AUSA2 testified that she did

not know McMahill was part of the Oregon defense team until May 2012. Tr. 697. AUSA2's

notes from a team meeting on May 18, 2012 indicate that on that date the prosecution team

learned Wolf had been appointed to represent Pedersen on a potential Oregon death penalty

prosecution and that McMahill would be assigned to work with Wolf. Ex. 139. AUSA1 testified

that she remembered hearing that McMahill might be working with Wolf in May 2012, but did

---

    [15] AUSA1's testified that Bovett had said McMahill's communications were not privileged because she was misrepresenting herself. Tr. 901, 911. There is no evidence whatsoever that McMahill misrepresented herself or engaged in any other "bad conduct."

not know for certain until September 2012. Tr. 896.

On April 20, 2012, ODOC Captain sent an interoffice memorandum to Brian Belleque, the West Side Institutions Administrator for ODOC regarding McMahill. Ex. 109. The memorandum advises Belleque that the Washington Department of Corrections had not treated McMahill's communications with Pedersen as privileged and that after conferring with the Lincoln County District Attorney (Bovett) and the Marion County District Attorney's office "it was determined that her communication in Oregon with [Pedersen] is not 'protected' or 'privileged' either." *Id.* The memorandum goes on to detail various communications between Pedersen and McMahill. That memorandum correctly notes that "part of her job is to get Inmate Pedersen to trust her and reveal personal things about himself, that will assist her in helping to provide a defense." *Id.*

At a meeting on September 18, 2012, the prosecution team discussed McMahill again and Detective Steele asked to continue monitoring McMahill's calls. Exs. 158-59; Tr. 902-03. At that meeting, the AUSAs noted that a taint team might be needed to monitor McMahill's calls and they requested that Detective Steele send them the communications synopsis so they could determine whether additional monitoring was appropriate. Tr. 903. That same day, Detective Steele sent a copy of the McMahill communications synopsis to the prosecution team AUSAs. The subject line of the email is "Tess info" and the body of the email reads "Here it is." Ex. 160. In response, AUSA1 wrote that, "[t]his is reminding me of the need for a taint team – have we made any progress with that? [AUSA2], do you want me to request one or more AUSA's to be available to review anything in doubt?" Ex. 161. The two AUSAs reviewed the synopsis and neither was concerned that McMahill was engaged in any illegal activity. They told Detective

PAGE 28 - AMENDED SUPERVISORY OPINION

Steele that they would not have her calls monitored. Tr. 870-71. Neither AUSA notified the court or the defense that they had reviewed the synopsis or that members of the prosecution team had listened to McMahill's legal calls with Pedersen and read his legal mail. That information would not be revealed until November 2013, after defense counsel had raised concerns regarding the confidentiality of Pedersen's legal communications.

During the evidentiary hearing, the AUSAs were questioned regarding Oregon Rule of Professional Conduct (ORPC) 4.4(b). ORCP 4.4(b) requires "[a] lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender." When asked about ORPC 4.4(b) during the evidentiary hearing, AUSA2 testified that "when I became aware there was this letter from or to Gil Levy, I shut the thing down. I didn't want anybody to look at it. I didn't want anybody contaminated by it. I didn't want to see it." Tr. 751. However, she did not notify Levy, or any other member of Pedersen's defense team that members of the prosecution team had received the letter or the McMahill communications synopsis. She also testified that she did not know whether ORPC 4.4(b) applied during the course of an active criminal investigation. Tr. 783. AUSA1 testified that she did not make the connection that the McMahill communications synopsis might be privileged. Tr. 911. She had remembered "discussions earlier when they were saying that Tess McMahill was claiming to be a forensic psychologist; that they did not believe that she was a member of the defense team " and that "Bovett had given an opinion that he did not think she was part of the defense team." *Id.* AUSA1 testified that although she is not a member of the Oregon State Bar, "[i]f I learned, as we did through [AFPD Manes], that we may

PAGE 29 - AMENDED SUPERVISORY OPINION

have received inadvertently privileged information, I would go back and notify whoever the lawyer was that we had obtained that, as we did with Mr. Woods' lawyer, and I would also go to the source . . . to say . . . you can't send us this." Tr. 939.[16] It is not clear why similar procedures were not followed with respect to Pedersen's legal mail.

      B.     Filter Team Procedures

On November 9, 2012, the prosecution team AUSAs issued a memorandum to Analyst F, Agent F, AUSA Asphaug and AUSAF providing filter team instructions for the case. Ex. 12. This filter team has come to be known as Filter Team One. As discussed above, AUSA Asphaug did not perform any work for Filter Team One.

The filter instructions were created to prevent the disclosure of any defense strategy "whether or not the information is protected by the attorney-client privilege or the work product privilege; prevent the disclosure of any 'legal mail' to the prosecution team; and ensure that we effectively document our efforts to do so." Ex. 12 at 2. The filter team instructions discuss the interception of the "'Monroe letters," and the directives that the AUSAs gave to OSP regarding those letters. *Id.* at 2. The instructions make no mention of the interception of McMahill's legal calls. In fact, the instructions relate strictly to legal mail and provide no guidance whatsoever concerning legal calls. The primary tasks of Filter Team One were to review correspondence between Pedersen and Grigsby and filter it for potential joint defense agreement privilege; review all Monroe letters for potentially privileged information, except for Pedersen's correspondence with Wolf; return Pedersen's correspondence with Wolf to Wolf without reviewing it; and return

---

[16] The prosecution team inadvertently provided defense counsel with recordings of legal calls from a cooperating witness. Defense counsel immediately notified the prosecution of the calls without listening to them.

any other legal mail to defense counsel without reviewing it. Analyst F and Agent F were

charged with undertaking the initial organization and review of materials while AUSAF was

tasked with the final review and with providing unprivileged discovery to the prosecution team

and the defense and privileged materials to the defense only.

Per the instructions, AUSAF was allowed to participate not only in reviewing potentially

privileged material for Filter Team One but also in the prosecution by "assist[ing] with other

legal research, writing, and analysis, at the district court level and in any appeals." *Id.* at 3. The

filter team instructions specifically contemplate the review of legal mail in order to determine

whether it qualifies for the attorney-client privilege. *Id.* at 6. The filter team instructions were

not submitted to, nor approved by, the court.

On November 14, 2012, AUSA1 sent an email to both the prosecution team and Filter

Team One requesting that Detective Steele, ODOC Captain, and Analyst 1 provide AUSAF with

the Monroe legal mail. Ex. 172. They never sent AUSAF the Monroe legal mail and she never

requested it. Tr. 495, 524, 540. Electronic copies of the Monroe legal mail remained with

ODOC Captain until Filter Team Two began its work on this case and those letters were not

provided to defense counsel until January 7, 2014. Ex. 223.

In late November 2012, Analyst F sent AUSAF handwritten notes from Grigsby and a

disc containing Pedersen's jail calls. On November 28, 2012, AUSAF emailed other members of

Filter Team One and said that the disc contained "two completed calls to an attorney and these

ARE within the attorney-client privilege and should NOT be provided to the trial team." Ex. 11.

Rather than providing those to the defense, AUSAF returned the disc to Analyst F. Ex. 11; Tr.

502. Because AUSAF had received materials beyond the scope of the filter protocol, she spoke

PAGE 31 - AMENDED SUPERVISORY OPINION

with the prosecution team AUSAs and they clarified that she was only to review and filter

materials described in the filter protocol. Tr. 500-501. Later, AUSAF received additional discs

labeled "legal calls" from Analyst F. Tr. 502. Upon receiving the discs, she "went to [AUSA1]

and I told her that I was receiving additional material that was not correspondence between Mr.

Pedersen and Ms. Grigsby that was on discs, but I didn't know why and I wasn't sure what to do

with it." Tr. 502-03. AUSAF explained that she was receiving materials on discs beyond the

scope of the filter protocol, but does not remember specifically saying that the materials were

recordings of legal calls. Tr. 522. AUSA1 suggested she call Analyst F to find out what was

happening. Analyst F explained that she was removing legal calls that OSP was receiving from

MCDC and separating them out and was creating new discs of legal calls and sending those to

AUSAF. Tr. 503. AUSAF received discs of legal calls in January, April, May, and June of 2013

and stored them in her office without reviewing them. Tr. 503. She did not notify defense

counsel of the fact that she was receiving recordings of their legal calls.[17]

After AUSAF had been placed on Filter Team One, she assisted the prosecution by

providing legal research, writing, and analysis to the prosecution team AUSAs. Tr. 526, 723.

AUSAF testified that in light of what she had reviewed as a filter team member, she did not see a

conflict and did not "believe that anything I learned from that material in any way affected my

ability to do legal research or provide legal research support for the lawyers in this case." Tr.

527-28.

---

[17] On December 24, 2013, Analyst F sent another nine discs of legal calls to AUSAF,
which she provided to defense counsel as the second filter process had begun at this time and
defense counsel had objected to the prior process. Tr. 504-05; Ex. 10. On January 14, 2014,
AUSAF received one final disc of legal calls which she forwarded to defense counsel. Ex. 40.

When questioned during the evidentiary hearing why she had not notified defense counsel
or the prosecution team AUSAs that she was receiving privileged legal calls, AUSAF testified
that "although in my email I described it as attorney-client privileged materials, my memory is
that it didn't involve anything substantive . . . [i]t was a *de minimis* amount of information, and so
I simply didn't foresee that there was a larger problem." Tr. 523. When asked specifically
regarding her compliance with ORPC 4.4(b), she testified that "because I was a filter team lawyer
and not the lawyer assigned to the case, I just didn't see this rule as applying to what I was
looking at." Tr. 541-42. She also testified that she had complied with ORPC 4.4(b) because "as
I read Rule 4.4, it says that I'm to promptly notify the sender. In that case, the sender, to me, was
Analyst F, and I did notify her." Tr. 520.

C.      Continued Interception of Legal Calls

The prosecution team continued to intercept Pedersen's and Grigsby's legal calls after they
had been brought to Oregon to face federal charges in September 2012. During this time,
Pedersen was housed at MCDC and Grigsby was housed at the Columbia County Jail.

To be clear, nobody from the USAO intentionally requested defendants' legal calls. To
the contrary, most requests from the USAO were specifically for non-legal calls.[18] *See generally,*
Ex. 1 at 1-10 (emails requesting that MCDC and the Columbia County Jail send all non-legal
mail to Analyst F on the filter team and all non-legals calls to Detective Steele and emails from
AUSAs following the discovery of legal calls in discovery attempting to ensure that legal calls

---

[18] The only exceptions to this were two subpoenas issued by AUSA1 to the Snohomish
County Sheriff's Office and the Washington State Department of Corrections which requested
"any and all" calls and other correspondence. Ex. 1 at 11-14. However, it does not appear that
any of the privileged materials obtained by the prosecution were obtained pursuant to these
subpoenas. Tr. 878.

PAGE 33 - AMENDED SUPERVISORY OPINION

are not recorded by the jails).

Despite the efforts of the AUSAs, both defendants' legal calls were recorded and were provided to the prosecution team. Between September 2012 and October 2013, the prosecution team received recordings of seventy-seven of Pedersen's privileged telephone calls from MCDC including fourteen calls between Pedersen and Levy, one call between Pedersen and Wolf, eleven calls between Pedersen and AFPD Manes, thirty-nine calls between Pedersen and Capital Case Specialist Debra Garvey, and twelve calls between Pedersen and McMahill. Ex. 106. These calls were recorded by Securus Technologies, a third party telephone service provider for MSCO, and the majority of the recordings were provided to Detective Steele on compact discs. Exs. 178-79, 183, 192, 201. These calls were recorded, despite the fact that the system employed by Securus Technologies does not typically record calls to a number that has been identified as belonging to an inmate's lawyer. It appears that a number of the defense team's telephone numbers had not been privatized in the Securus sytem. Tr. 373. Wolf's number had been privatized but he was recorded on one occasion nonetheless. Tr. 456; Ex. 235.

As discussed above, Grigsby pleaded guilty prior to the evidentiary hearing and the court has comparatively little information regarding the interception of her legal calls. However, at least six calls between Grigsby and her defense team were recorded and provided to the prosecution team between September 26, 2012 and December 19, 2012. Sealed Mem. [193] at 9.

The fact that these calls were recorded and provided to the prosecution went undetected for over a year in part because neither defendant received any jail telephone calls dating after October 2012 through discovery until November or December 2013, even though the

government had been receiving recordings of the defendants' calls on a regular basis.[19]

        D.     Initial Litigation Concerning Confidentiality of Defense Communications

      Totally unrelated to the interception of legal mail and legal calls, of which defense

counsel (and the court) were entirely ignorant, Pedersen became concerned in June 2013 that the

MCSO and U.S. Marshal's Service had potentially divulged privileged information to the USAO.

      The MCSO had been reviewing material Pedersen brought to legal visits and had

demanded explanations from counsel regarding how the material related to his defense. During

oral argument on June 20, 2013, AUSA2 stated that "I have had no communications with the

Marshal's office or MCDC about any communications between Mr. Pedersen and his counsel"

and that the "U.S. Marshal brought to our attention, on two occasions, reports related to these

conditions of confinement . . . That's it. There have been no substantive communications to me

about anything having to do with his communications with counsel." Out of an abundance of

caution, the court ordered the USAO to produce to the defense "any and all communications,

whether recorded or not, from the U.S. Marshal and/or [the MCSO] that relate in any way to

Pedersen's interactions or communications with his legal team." Op. and Order [117] at 9. In

response to that Order, the USAO turned over a number of emails, visitor logs, and other

communications pertaining to Pedersen's interactions with his legal team that led this court to

conclude that "the USAO has received considerably more information about defense team

interactions than this court had been led to believe." Sealed Order [144] at 4.

      Additionally, the AUSAs filed declarations from MCSO officers concerning Pedersen's

---

[19] A small portion of this delay can be attributed to the review conducted by Filter Team
Two once it was clear legal calls had been received by the prosecution team.

interactions with his defense team that were false. In response to the declarations from the MCSO and the other documents submitted by the USAO, the court noted that it did not "believe that [AUSA2] intentionally misrepresented the level of communication between the MCSO, the U.S. Marhsal, and the USAO, but her statements were inaccurate." *Id.* The court took the USAO to task for obtaining information concerning defense team interactions, for filing false allegations from the MCSO by way of declaration, and for inadvertently misrepresenting the amount of information the USAO had obtained concerning defense team communications.

At that time, the court and the defense were still unaware that the prosecution team had intercepted privileged telephone calls and legal mail as that information was not turned over in response to the June 20, 2013 Order requiring "any and all communications, whether recorded or not, from the U.S. Marshal and/or [the MCSO] that relate in any way to Pedersen's interactions or communications with his legal team." In gathering the records ordered, it does not appear that either of the prosecution team AUSAs requested information from OSP or AUSAF. Tr. 927-29. They also did not reveal that they had been given the McMahill communications synopsis or that members of the prosecution team had reviewed the Monroe legal mail.

Nevertheless, U.S. Attorney Amanda Marshall and Criminal Chief AUSA Billy Williams believed that the court had overreacted to the information that had been produced and filed a Sealed Motion to Amend the Sealed July 3, 2013 Order. [155]. In that Motion, the USAO asserted that "there has been no interference with Pedersen's defense and no Sixth Amendment violation." [155] at 2. Moreover, the USAO asserted that "[t]he government has not received any material from either the USMS or the MCSO that constitutes protected or privileged information as defined by law" and that "no member of the USAO has been apprised of the substance of any

PAGE 36 - AMENDED SUPERVISORY OPINION

communications between Mr. Pedersen and his legal team." *Id.* at 3 and 5.   Lastly, the USAO

asserted that AUSA2's "statements to the court were accurate."[20]  Even without the information

the court would later learn concerning privileged telephone calls and legal mail, the court had

little trouble in concluding that its prior Order was accurate.  Knowing what the court has since

learned, it is not concerned in the least that the Order was overly harsh.

       E.      Discovery of Privileged Calls in Discovery and Resulting Litigation

In September 2013, Pedersen's counsel discovered for the first time that the USAO was in

possession of a number of defendants' privileged telephone calls that had been recorded while

defendants' were incarcerated.[21]  These calls were not turned over to defendants in response to

this court's Opinion and Order [117] but inadvertently through the normal course of the

disorganized discovery.  The discovery included six of Grigsby's calls that were recorded after

she had been indicted on federal charges and twenty-seven minutes of telephone calls between

Pedersen and Wolf and thirty minutes of telephone calls between Pedersen and McMahill that

were recorded by the Snohomish County Jail before Pedersen's transfer to Monroe.  Tr. 880; Ex.

164; Sealed Mem. [193] at 9.

Both defendants filed motions for additional discovery from the USAO, the USMS,

Multnomah County, and Columbia County regarding interference with their Sixth Amendment

---

[20] No evidence was presented that USA Marshall or Chief Deputy Williams were aware
of the interception of any of defendants' legal communications including the Monroe legal mail
or the McMahill communications synopsis at the time they filed the Motion to Amend.
However, both AUSA1 and AUSA2 were aware of the Monroe legal mail and the McMahill
synopsis at the time the Motion was filed.

[21] In October 2013, defense counsel discovered that the USAO had also produced
privileged telephone calls of an unindicted co-conspirator to defendants.

rights and requested that litigation concerning the discovery be handled by the filter team. In response to an email from the court regarding defendants' proposed procedures for the requested discovery, AUSAF responded that "Scott Asphaug will be handling any litigation regarding this recent filing and will accept sealed filings on the government's behalf. I have been serving as the taint reviewer for our office. In that capacity, I have not supervised or exercised any control over the filter team. I have screened and redacted material received from the team." Email dated 9/19/2013. AUSA Asphaug began litigating the Sixth Amendment issues on behalf of the government through what would come to be known as Filter Team Two. In large part, AUSA Asphaug did not object to the production of the discovery requested. On October 28, 2013, this court ordered [266] the production of the majority of the requested discovery. The court further ordered Filter Team Two to provide the court with a Filter Team Report concerning the recording and receipt of legal calls.

As Pedersen began to receive discovery from Multnomah County, the breadth of the problem came into focus and Pedersen filed an Emergency Motion for Order to Protect Confidentiality of Attorney-Client Communications [279]. Pedersen requested information from Securus Technologies, an order requiring OSP to deliver electronic storage devices to the court for review by defense experts, and an order requiring OSP to turn over documents concerning privileged recordings. The court granted in part and denied in part [291] the motion for emergency relief and ordered Securus Technologies to provide defense counsel with information concerning legal calls and ordered Filter Team Two to compile additional information for the Filter Team Report.

Although the prosecution team had denied reviewing any privileged materials, the court

PAGE 38 - AMENDED SUPERVISORY OPINION

was gravely concerned that the prosecution team had accessed, and possibly listened to, privileged calls. Additionally, the court did not believe it was in a position to rely on the representations of the prosecution team as the prosecution team had failed to turn over a startling amount of information in reference to this court's Order [117] of June 20, 2013, and had denied the existence of documents later found to be in its possession.

Nevertheless, the court did not believe it was prudent to provide the defense with access to OSP computers as it may have jeopardized the investigation of this case and others. Therefore, the court denied Pedersen's request for access to OSP computers and at the same time began communicating with the Oregon Department of Justice. Over the course of the next several days, the Oregon Department of Justice voluntarily agreed to assist the court and conduct an internal forensic examination of Detectives Steele's and Analyst F's computers and other electronic storage devices and provide a sealed report to the court for *in camera* review. The Oregon Department of Justice requested a court order authorizing the forensic examinations. On November 19, 2013, the court entered a Sealed Order [293] authorizing a forensic examination "in order to determine whether either detective currently possesses any privileged recordings or has accessed or listened to such recordings in the past."[22] The Oregon Department of Justice was ordered not to provide Detective Steele, Analyst F, or any other third party with advance notice of the forensic examination and was also ordered not to listen to the substance of defendants' privileged recordings. Approximately one week later, the Oregon Department of Justice seized the computers and electronic storage devices, made mirror images of the hard drives, and

---

[22] At that time the court was operating under the mistaken belief that Analyst F was a detective on the prosecution team rather than an analyst on Filter Team One.

returned them to Detective Steele and Analyst F.

The forensic report was eventually produced in January 2014. Ex. 217. By that time, the court had learned that Analyst F was a member of Filter Team One. The forensic analysis revealed that her computer contained privileged calls in the recycling bin and computer artifacts indicated privileged calls had been played on her computer. On Detective Steele's computer, there were artifacts indicating that one privileged call had been stored at one time on the computer. Ex. 217 at 2. Despite the fact that relatively little evidence was found on Detective Steele's computer and an email dated February 7, 2013 that Detective Steele was providing calls to Analyst F for filter review, the court is of the belief that Detective Steele listened to the discs of legal calls provided to him. Ex. 180. The forensic examination of his computer may not have revealed this information because Detective Steele had access to multiple computers and it is possible that the computer used to listen to calls was not examined or because he listened to the calls in a manner that did not leave computer artifacts. Tr. 286, 387; *see also*, Ex. 187 (email from MCSO officer to Securus Technologies dated May 7, 2013 stating that "I got a call from OSP Detective Steele and he said that I mailed a CD of Pedersen received by him on 02/19/13 but that they were unable to listen to it . . . Detective Steele did note that all other CD's have been perfect and functioned well"); Ex. 21 (email dated October 28, 2013 from Detective Steele to Analyst F notifying her that the discs of Pedersen's calls will play on his computer).

On November 26, 2013, Filter Team Two provided the court with its first report [303], to which it attached lengthy exhibits for *in camera* review. The court reviewed the exhibits and ordered certain portions to be provided to the defense. A supplemental report [372] with additional discovery was provided on February 11, 2014, and additional discovery recovered

PAGE 40 - AMENDED SUPERVISORY OPINION

from OSP was provided for *in camera* review on March 28, 2014. The bulk of the information recited above was provided by Filter Team Two as well as the MCSO and Securus Technologies.

During the evidentiary hearing, the government took the position that the calls and letters possessed by the prosecution team, though between a capitally charged defendant and his defense team, may not have been legal, substantive, or privileged in nature. Because the court was unwilling to allow the attorneys representing the government to review the privileged materials as requested, as such review would further violate defendants' Sixth Amendment rights, the court undertook an *in camera* review of some of the legal calls and letters.

It should go without saying that, regardless of the content, private communications between a defendant and his or her defense team should be treated as privileged unless otherwise ordered by the court. *Fisher v. United States*, 425 U.S. 391, 403 (1976) ("[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged"). Moreover, after reviewing the communications submitted, the court found [422] that the communications intercepted by the prosecution team contained significant substantive content regarding a number of issues including the facts of the case, legal issues pertaining to the case, defense strategy, and discussions regarding the conditions of Pedersen's confinement. For instance, a call between McMahill and Pedersen on November 21, 2011 was approximately twenty-five minutes long and contained substantive discussions regarding a number of topics material to Pedersen's case. That call was listened to by Analyst 1 and likely others and was memorialized in the McMahill communications synopsis. The information recorded in that synopsis was but a small portion of the total information contained in that telephone call. The court is unaware whether and how the privileged information obtained by the prosecution team

PAGE 41 - AMENDED SUPERVISORY OPINION

was utilized by the prosecution's law enforcement agents.

**DISCUSSION**

It appears that because there was overwhelming evidence of guilt in this case, the government took a *laissez faire* approach to its obligations to provide discovery and protect defendants' Sixth Amendment rights. That this occurred in a potential capital case is disturbing. These obligations must never be neglected, especially in a capital case. It is axiomatic that the court, and the government, cannot protect the rights of the innocent without also protecting the rights of the guilty. Although the discovery violations and interference with defendants' attorney-client privilege are in some ways related, and both raise questions regarding defendants' fundamental due process rights, the court will address each in turn and will provide suggestions to ensure that similar violations do not recur.

**I.    Discovery Violations**

The provision of discovery in this case was untimely and incomplete. Aside from Detective Steele's intentional withholding and destruction of evidence, the discovery violations occurred primarily as a result of insufficient organization and communication on the prosecution team, the decision not to review discovery prior to production, and the government's failure to notify the court or defense counsel regarding the scope of the discovery problems.

**A.    Organization and Training**

It is clear that organizational and communication difficulties were a pervasive problem in this case. These difficulties led, in part, to missing discovery and the production of most discovery long after the discovery deadline.

At the outset of the case, OSP was supposedly tasked with receiving and organizing all

PAGE 42 - AMENDED SUPERVISORY OPINION

discovery. However, it does not appear that everybody was on the same page as discovery from Eureka, CA was sent to the FBI rather than OSP and then sat in the FBI's evidence storage until after the discovery deadline had passed. Moreover, it was not until after the discovery deadline had passed, and the USAO became aware that discovery was in disarray, that anybody asked for evidence logs and lists from the various law enforcement agencies involved in the case. That step was not taken until Cooke was essentially sounding alarm bells concerning discovery in the case and it is difficult to understand why this basic step was not made as soon as the government decided to charge the case. As a result, huge amounts of discovery were not produced in a timely manner, most notably, statements made by defendants and discovery from the jurisdiction in which one of the four murders took place.

Compounding the general disorganization of evidence collection and distribution were issues particular to OSP's organizational system. Although it is OSP's general practice to segregate evidence from reports concerning that evidence, the USAO was unaware of this until April 2013. Additionally, it does not appear that OSP understood that it was required to turn over both guilt/innocence phase discovery as well as penalty phase discovery. While both AUSAs testified that they had repeatedly asked for all discovery, the fact remains that OSP did not understand this to include penalty phase discovery. For OSP to not understand what material should have been turned over suggests that there were breathtaking communication problems on the prosecution team.

The court understands that this case was more complex than the typical case owing to the numerous law enforcement agencies involved. However, this was not the first complex case charged in the District of Oregon. Time and again the USAO has shown itself capable of

PAGE 43 - AMENDED SUPERVISORY OPINION

handling complex cases ably and professionally. This case presents a marked deviation from

what the court has come to expect. It is not simply a matter of a case not progressing smoothly.

Disorganization on this scale impacts a defendant's rights to discovery under Federal Rule of

Criminal Procedure 16 and *Brady* and its progeny.[23]

Rule 16 "grants criminal defendants a broad right to discovery" and requires the

government to disclose, among other things, a defendant's oral, written, and recorded statements

as well as any documents or objects material to preparing a defense. *United States v. Stever*, 603

F.3d 747, 752 (9th Cir. 2010); Fed. R. Crim. P. 16(a)(1)(A),(B), and (E). Rule 16 requires

disclosures beyond those required by *Brady*'s mandate to produce to the defense "evidence

favorable to an accused" that is "material either to guilt or to punishment." *Brady v. Maryland*,

373 U.S. 83, 87 (1963). In a properly organized case, Rule 16 serves as a prophylactic to *Brady*

violations. Such was not the case here. Not only did the government fail to timely turn over vast

quantities of evidence material to preparing a defense, including the defendants' recorded

statements (both legally and illegally recorded statements), but the government also failed to

timely produce *Brady* material such as Grigsby's invocation of counsel, the death penalty

interviews, and the photograph of Pedersen submitted by his sister. The government has an

affirmative duty to search for this type of material. *United States v. Price*, 566 F.3d 900, 903

(9th Cir. 2009) ("[u]nder longstanding principles of constitutional due process, information in the

---

[23] This case presents a unique set of facts insofar as the government's discovery failures
came to light prior to trial and both defendants subsequently pleaded guilty. This is not to say the
violations were harmless, but at the same time, it is impossible to apply the materiality standard
set forth in *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) without a trial. As discussed above, the
court is not determining whether the government's discovery violations were prejudicial to
defendants' trial preparation or whether the government was acting in bad faith.

possession of the prosecutor *and* his investigating officers that is helpful to the defendant . . . must be disclosed to the defense"). The disorganization in this case was of a scope and quality that suggests the government viewed its discovery obligations, and this court's discovery deadline, as advisory in nature. Regardless of which law enforcement agencies and how many law enforcement agencies are involved in the investigation and prosecution of a criminal defendant, the government must ensure that the prosecution team is sufficiently organized to meet its discovery obligations.

B.    Failure to Review Discovery

In this case, the government made a decision not to review discovery prior to producing it to defendants. This decision appears to have been made in large part because the government had decided to withhold very little discovery in light of the government's broad discovery obligations in a potential death penalty case. The government apparently lost sight of the fact that the purpose of reviewing discovery is not only to prevent the disclosure of certain evidence to the defense, but "[t]o ensure that all discovery is disclosed on a timely basis." Ogden Memo. Ex. 351 at 4.

While review of discovery is strongly recommended by the District of Oregon Criminal Discovery Policy, the Federal Criminal Discovery Blue Book, and the Ogden Memo, the court acknowledges that review of *all* discovery is infeasible in every case and a line-by-line review of discovery in this case likely was infeasible. However, it is evident that the government reviewed so little discovery that it was largely unaware of what had and had not been produced. Accordingly, the government did not notice that it had not produced, among other things, the Cody Meyers crime scene photos, the death penalty interviews, one year worth of defendants' jail

PAGE 45 - AMENDED SUPERVISORY OPINION

recordings, or the discovery from Eureka, California, one of three jurisdictions where a victim was murdered. It is one thing not to review every piece of discovery and something else entirely to have reviewed so little that one does not notice numerous gaping holes in what should have been produced.

Compounding the government's decision not to review discovery was the fact that the government assumed it had produced everything and proceeded accordingly. This assumption led the government to argue in June 2013 that it had "far exceeded its discovery obligations under Federal Rule of Criminal Procedure 16(a), as well as *Brady*, *Giglio*, and the Jencks Act" when in fact, it had not yet produced staggering quantities of Rule 16 discovery and some *Brady* material. Gov't's Resp. [108] at 5. It also led the government to oppose two of Grigsby's requests for extensions of the DPP while arguing that it had produced more than enough discovery. The simple fact is the government did not know what it had and had not produced because the AUSAs chose not to review sufficient quantities of discovery to form a reasonable basis for their beliefs. The government should not have made arguments relying on the production of discovery from a position of such ignorance. *Chapman*, 524 F.3d at 1085 (chastising AUSA who "repeatedly represented to the court that he had fully complied with *Brady* and *Giglio*, when he knew full well that he could not verify these claims").

C.      Failure to Notify the Court and Counsel Regarding Discovery Problems

Perhaps the most troubling aspect of the discovery production in this case is that the government did not acknowledge what it must have known to be widespread problems until late in the case. As relayed in the facts above, beginning in April 2013, the prosecution team became aware that there were some potentially serious problems with the production of discovery. The

PAGE 46 - AMENDED SUPERVISORY OPINION

discovery deadline had passed and the Cody Meyers crime scene photos had not been produced. Cooke emailed the AUSAs in April because she was concerned that nobody was keeping track of discovery and what had and had not been produced to defendants. Ex. 3 at 21. The indexing process Cooke began revealed only more problems prompting the AUSAs to, for the first time, request all evidence logs, lists, and indices from the various law enforcement agencies.

Despite the fact that Cooke was raising serious concerns regarding the production of discovery, for which she is to be commended, the AUSAs did not notify the court or defense counsel regarding the existence of these problems. Until defense counsel exposed the gravity of the situation in October 2013, the government did not so much as request an extension of the discovery deadline. Rather it continued to produce volume after volume of late discovery and opposed Grigsby's motions for extensions of time without acknowledging that there were systemic problems. *See, e.g.*, Exs. 264, 267, 268, 270, 275, 277, and 279.

Even at the hearing on October 2, 2013, when the government had been aware for more than two weeks that it had not produced the death penalty interviews, the government did not raise the issue. Instead, the government argued that it had produced enough discovery. The next day, it produced Volume 31 of discovery after the court had taken Grigsby's request for an extension of time under advisement. It was the unannounced production of discovery coupled with representations that the government had met its discovery obligations that led both defendants to request a finding of bad faith in accordance with the Ninth Circuit's *Chapman* decision.

In *Chapman*, during the third week of trial, it became clear that the government had not turned over material in accordance with its obligations under *Brady* and *Giglio*. 524 F.3d at

PAGE 47 - AMENDED SUPERVISORY OPINION

1078. When initially confronted with allegations that the government had failed to turn over impeachment material, the AUSA responded that he believed he had turned over all relevant material. When pressed to provide proof that the government had turned over the discovery, the AUSA attempted to avoid the issue by suggesting he provide the material at that time. The AUSA was eventually forced to admit that he could not document which materials the government had turned over because his office had not maintained a log of its discovery production. *Id.* at 1078-79. The district court dismissed the indictment with prejudice after finding that the AUSA had acted "flagrantly, willfully, and in bad faith" and had made "affirmative misrepresentations to the court." *Id.* at 1084 (quotations omitted).

In upholding the district court, the Ninth Circuit held that "accidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior." *Id.* at 1085 (citing *United States v. Kearns*, 5 F.3d 1251, 1255 (9th Cir. 1993)). However, the court noted that a "reckless disregard for the prosecution's constitutional obligations" could rise to the level of "flagrant misbehavior." *Id.* In that case, "the failure to produce documents and to record what had or had not been disclosed, along with the affirmative misrepresentations to the court of full compliance, support[ed] the district court's finding of 'flagrant' prosecutorial misconduct even if the documents themselves were not intentionally withheld from the defense." *Id.* The Ninth Circuit evaluated both "the government's willfulness in committing the misconduct and its willingness to own up to it." *Id.* at 1087 (quoting *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993)).

When confronted with the possibility that defendants would be requesting a bad faith finding from the court, the AUSAs initially attempted to minimize the discovery problems. Most

PAGE 48 - AMENDED SUPERVISORY OPINION

notably, AUSA2's declaration stated that the USAO had been producing detailed discovery

indices with every production of discovery and AUSA1 made arguments in reliance on that

declaration. Those statements regarding the discovery indices were factually inaccurate. It

appears that the declaration of counsel was filed in order to demonstrate that, unlike the AUSA in

*Chapman*, the prosecution in this case had been keeping records of what had and had not been

produced. Ironically, in attempting to distinguish the discovery practices in this case from those

in *Chapman*, the AUSAs "paper[ed] over" their mistakes and failed to own up to the gravity of

the situation, perhaps the more serious element of the prosecutorial misconduct in *Chapman*, 524

F.3d at 1085-87. Fortunately, AUSA1 backed away from some of her early arguments and

AUSA2 filed a second declaration acknowledging that the first was incorrect. However, when

confronted with pervasive discovery problems early in the case, the AUSAs should have

explained the situation and requested a second extension of time.

    After the nature of the discovery problems came to light, the government began its

comprehensive discovery audit. During that process, the government acknowledged the gravity

of the situation and notified both the court and defense counsel that additional discovery would

be forthcoming. The discovery audit, late though it was, was handled with the professionalism

and competency that this court has come to expect from the USAO.

## II.    Sixth Amendment Violations and the Attorney-Client Privilege

    In this case, the government violated defendants' rights to confer with their attorneys in

confidence. These violations resulted from both intentional conduct and neglect. They

continued for years because the discovery was untimely, because the filter team protocol was

deficient, because the filter team protocol was not followed, because nobody notified defense

PAGE 49 - AMENDED SUPERVISORY OPINION

counsel regarding these problems, and because nobody raised these issues with the court despite

many opportunities to do so. The court will examine these problems as well as potential

solutions for moving forward.

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389

(1981). The purpose of the privilege "is to encourage full and frank communication between

attorneys and their clients and thereby promote broader public interests in the observance of law

and administration of justice." *Id.* A lawyer's ability to provide sound legal advice to her client

and advocate on her client's behalf "depends upon the lawyer's being fully informed by the

client." *Id.* Accordingly, the law is loathe to violate this privilege and "[o]nce an accused has a

lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-

client relationship takes effect." *Patterson v. Illinois*, 487 U.S. 285, 290 n.3 (1988). "It is clear

that government interference with a defendant's relationship with his attorney may render

counsel's assistance so ineffective as to violate his Sixth Amendment right to counsel and his

Fifth Amendment right to due process of law." *United States v. Irwin*, 612 F.2d 1182, 1185 (9th

Cir. 1980). "[S]ubstantial questions of fundamental fairness are raised where, in connection with

a criminal prosecution, the government invades the privilege." *United States v. Neill*, 952 F.

Supp. 834, 839 (D. D.C. 1997).

The importance of open communication between lawyer and client is never more vital

than in a capital proceeding both because of the sentence that may be imposed and the sensitivity

of the topics that must be explored in preparing a defense. Capital counsel are tasked with

investigating "*all* reasonably available mitigating evidence," including the defendant's "medical

history . . . *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quotations omitted, citing American Bar Association Guidelines (ABA) for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (1989)); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases Rev. 10.5 (2003) (providing that counsel "should make every appropriate effort to establish a relationship of trust with the client" and that establishing a relationship of trust is essential "to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense"). Open communication is vitally important to providing the heightened standards of reliability required in a capital prosecution. "In capital proceedings generally, [the Supreme Court] has demanded that factfinding procedures aspire to a heightened standard of reliability . . . This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (citing *Spaziano v. Florida*, 468 U.S. 447, 456 (1984); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). It is therefore especially troubling that defendants' attorney-client privilege was not guarded zealously by the government in this case.

A.    Failure to Disclose Violations of the Attorney-Client Privilege

The law enforcement members of the prosecution team began obtaining Pedersen's privileged legal communications with McMahill in either late 2011 or early 2012. At a meeting on April 13, 2012, the prosecution team as a whole discussed the law enforcement members' concerns about McMahill, concerns that were raised by reviewing privileged material. At that meeting, the AUSAs discussed the fact that McMahill was holding herself out to be a member of

PAGE 51 - AMENDED SUPERVISORY OPINION

Pedersen's defense team.  By April 13, 2012, the AUSAs were put on notice that members of the prosecution team had potentially intercepted Pedersen's legal communications, but they did not make any effort to determine whether McMahill was in fact a member of the defense; they did not instruct members of the prosecution team to cease reviewing the communications; and they did not request permission from the court to review her communications.

On June 15, 2012, the AUSAs became aware that Pedersen's legal mail was being received from Monroe.  They correctly told the prosecution team to cease reviewing the material and that they would have a taint team handle the matter.  However, they did not notify defense counsel; they did not notify the court; and they did not set up a taint team for five months.

At a meeting on September 18, 2012, the AUSAs requested a copy of the McMahill communications synopsis from Detective Steele.  That synopsis clearly states that McMahill believed the legal calls to be privileged, as they should have been treated.  The AUSAs reviewed and discussed the synopsis.  They were aware that she was working on Pedersen's behalf at that time.  They did not notify defense counsel, did not provide a copy of the synopsis to counsel, did not tell the other members of the prosecution team that they should not have reviewed the communications, included no provisions in the Filter Team Protocol regarding legal calls, and did not seek guidance from the court.

AUSAF received discs of Pedersen's privileged calls in November 2012, and January, April, May, and June of 2013.  Those discs included numerous recordings of Pedersen's legal calls from MCDC where he was being held on the charges in this case.  AUSAF did not notify defense counsel that their calls were being recorded, did not provide counsel with copies of the recordings, did not notify the court, and did nothing to stop the ongoing recording of a capitally

charged defendant's legal calls.

All of the above information was concealed, intentionally or not, from defendants and from the court until Filter Team Two produced its report in November 2013. It is not as if the government did not have an opportunity to alert the court or counsel regarding these intrusions into defendants' Sixth Amendment Rights. On June 20, 2013, the court specifically ordered the USAO to produce to the defense "any and all communications, whether recorded or not, from the U.S. Marshal and/or [the MCSO] that relate in any way to Pedersen's interactions or communications with his legal team." Op. and Order [117] at 9. Granted, the court did not order the USAO to turn over Pedersen's privileged jail recordings from Washington, but one would think the AUSAs might understand the court was concerned about such things generally. In fulfilling this court's order to turn over information related to the interception of privileged material, the AUSAs did not confer with either Filter Team One or with OSP. The government not only failed to turn over any of the information from Washington, of which the AUSAs were aware, but also failed to produce recordings of Pedersen's legal calls from the MCSO, of which OSP and Filter Team One were aware and which were directly responsive to this court's June 2013 Order. As a result of these repeated failures to notify, dozens of defendants' legal communications were intercepted by the prosecution team after defendants were brought to Oregon to face federal charges and after the AUSAs had been put on notice that members of the prosecution team were collecting privileged recordings.

In addition to a responsibility to avoid undue interference with a defendant's attorney-client relationship and an obligation to respect a defendant's Sixth Amendment rights, the government has a duty to disclose the receipt of a defendant's attorney-client communications.

PAGE 53 - AMENDED SUPERVISORY OPINION

Under Rule 16, "*[u]pon a defendant's request*, the government *must* disclose to the defendant, and make available for inspection, copying, or photographing, all of the following: (i) any relevant written or recorded statement by the defendant if: the statement is within the government's possession, custody, or control; and the attorney for the government knows – or through due diligence could know – that the statement exists." Fed. R. Crim. P. 16(a)(1)(B). As outlined above, the government's attorneys were aware of numerous recorded statements falling under the Rule. Defendants requested all Rule 16 discovery and those statements were not provided. In addition, through due diligence, the government would have been made aware of numerous other statements falling under the Rule that were recorded after defendants were transferred to Oregon had the AUSAs inquired with other members of the prosecution team or with Filter Team One.

While defense counsel questioned the AUSAs regarding their ethical obligations in accordance with ORPC 4.4(b), the court's review of the Oregon State Bar's ethical opinions suggests that ORPC 4.4(b) is inapplicable where an attorney is intentionally, rather than inadvertently, provided with privileged attorney-client communications. *See*, Or. State Bar Formal Ethics Op. No. 2011-186 ("[b]y its express terms . . . Oregon RPC 4.4(b) does not require Lawyer to take or refrain from taking any particular actions with respect to documents that were sent purposely, albeit without authority"). Were the AUSAs to have received the privileged communications inadvertently, ORCP 4.4(b) would apply. As the government's agents intentionally obtained privileged communications and then intentionally provided them to the AUSAs, ORPC 4.4(b) is inapplicable. However, it would appear that both ORCP 8.4(a)(4) and the substantive law of privilege are implicated in this situation. *Id.* ORCP 8.4(a) provides that

PAGE 54 - AMENDED SUPERVISORY OPINION

"it is professional misconduct for a lawyer to . . . (4) engage in conduct that is prejudicial to the administration of justice."[24]

The delay in providing notice regarding the receipt of privileged communications is not excused by the filter team protocol. Nothing in Rule 16 provides for a lengthy period of delay in order to allow filter team procedures to be carried out. Rule 16 requires disclosure "upon a defendant's request." Members of the prosecution team delayed acting for several months and then deferred action to Filter Team One with respect to the Monroe letters. They did not act at all with respect to the McMahill synopsis or jail calls. Filter Team One did not comply with the filter protocol and did not act in accordance Rule 16.

B.    Taint Team Protocol and Adherence to Protocol

In this case, the filter team protocol was both grossly deficient and was not followed. The primary problems with the filter team protocol in this case were that it allowed filter team members to intentionally review privileged material, it allowed AUSAF to work on both the filter team and the prosecution team, and it did nothing to protect privileged telephone calls despite the fact that the government had intercepted such telephone calls.

The paramount purpose of a taint team is to prevent the disclosure of privileged information to the government and to protect the attorney-client privilege. *See United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1037-38 (D. Nev. 2006) (discussing use of taint teams in situations where the government has already obtained potentially-privileged materials and taint lawyers are used to segregate those materials and use of taint teams to execute search

---

[24] Should it be determined that the AUSAS violated ORPC 8.4(a)(4), it would also appear that Bovett failed to comply with the rule.

PAGE 55 - AMENDED SUPERVISORY OPINION

warrants where potentially privileged materials may be discovered). The use of a taint team does not allow the government to intentionally obtain and review attorney-client privileged material and when the government chooses to review such material it is a *per se* intrusion into the attorney-client privilege. *Neill*, 952 F. Supp. at 840-41 (discussing taint teams and finding the government "intentionally invaded attorney-client privilege" by having members of taint team review privileged materials during execution of search warrant); *see also United States v. Renzi*, 722 F. Supp. 2d 1100, 1112 (D. Ariz. 2010) (noting "that liberal use of taint teams should be discouraged because they present inevitable and reasonably foreseeable risks that privileged information may be leaked to prosecutors") (quotations omitted, citing *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)).

When considering the purposes of the attorney-client privilege, it is obvious that no governmental entity should intentionally review privileged material without the express approval of the court. The purpose of the privilege, as discussed above, is to foster open and honest communication between the client and lawyer. It would be a rare defendant who would feel comfortable speaking openly with his defense attorney knowing that somebody from the government, even a filter team attorney, was reviewing those communications.

In this case, the filter team protocol in some circumstances appears to authorize, and in other circumstances, tasks filter team members with reviewing privileged materials. Analyst F was asked to "perform the initial step in the filter review of all correspondence obtained from MCDC and [Columbia County Jail]." Ex. 12 at 5. She was asked to print all material received and to separate it into three categories: "1) correspondence between Pedersen and Grigsby; 2) correspondence identified as 'legal mail' or to or from one of the defendants and a member of the

PAGE 56 - AMENDED SUPERVISORY OPINION

defense team; and 3) all other correspondence." *Id.* The instructions require her to place the correspondence in category two in a sealed envelope and send it to AUSAF for forwarding to the defense teams. The instructions do not forbid her to review that material when she is separating and printing it. With respect to the Monroe letters, AUSAF was asked "to review all of the Monroe letters other than correspondence to or from Richard Wolf, to determine whether the letters should be treated as legal mail" *Id.* at 6. Those letters included communications between Pedersen, his Washington attorneys, and McMahill. If the letters were privileged or contained defense strategy, and did "not contain communications that would fall under the crime fraud exception to any attorney-client privilege, they should be sealed and returned to Pedersen's attorney." *Id.*

These instructions, by permitting the intentional review of privileged materials, allowed *per se* intrusions into the attorney-client privilege. *Neill*, 952 F. Supp. at 840.[25] As discussed above, a filter team is not entitled to review privileged materials, even under the auspices of a search for crime-fraud. The crime-fraud exception to the attorney-client privilege is applicable to "communications in furtherance of future illegal conduct." *United States v. Zolin*, 491 U.S. 554, 556 (1989). Crime-fraud presents an exception to the protections afforded materials that are otherwise considered attorney-client privileged. Only a court of competent jurisdiction can determine the applicability of the crime-fraud exception. If the government is concerned that there is crime fraud, of which there was no evidence whatsoever in this case, the government can

---

[25] The court does not find the review of letters between Pedersen and Grigsby to be similarly violative of the attorney-client privilege or any joint defense agreement as defendants should have been aware that the mail sent to one another would be subject to review and was not presumptively privileged.

PAGE 57 - AMENDED SUPERVISORY OPINION

request that the court conduct an *in camera* review of privileged materials. Such a request must be supported with "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996). The government may not intentionally review privileged communications in order to develop the factual basis supporting an *in camera* review. Allowing such a procedure would be tantamount to allowing police officers to conduct a warrantless search and then use the fruits of that search as the basis for a search warrant. It does not matter if an attorney or her representative is engaged in "bad" or unlawful conduct. The privilege exists until explicitly waived by the defendant or until a court determines that there is otherwise an exception to the privilege

The second serious problem with the filter team protocol was that it allowed AUSAF to assist the prosecution team. The protocol specifically tasked her with reviewing privileged materials and then allowed her "to assist [the prosecution team] with other legal research, writing, and analysis, at the district court level and in any appeals." Ex. 12 at 3. Even under the best of circumstances, there is a risk that privileged material may flow from the taint team to the prosecution. *Renzi*, 722 F. Supp. 2d at 1112 ("the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations") (citation and quotation omitted). The provision allowing AUSAF to serve in dual roles, which she in fact did, is difficult to understand and anathema to the very purpose of a taint team.

The final major deficiency in the filter team instructions is that they did not provide any

PAGE 58 - AMENDED SUPERVISORY OPINION

provisions for the protection of attorney-client telephone calls. At the time the instructions were written, the prosecution team AUSAs were aware that Pedersen's jail calls with McMahill had been intercepted by OSP. Both AUSAs testified that they were not aware that legal calls could be recorded by jails, yet they had both reviewed evidence to the contrary. As a result, discs of legal calls were reviewed by Analyst F and likely others and were then sent to AUSAF and sat in her office.

To make matters worse, the scant protections afforded by the filter team protocol were not always followed. In particular, ODOC Captain, Detective Steele, and Analyst 1 did not send AUSAF the Monroe letters despite explicit instructions to do so and AUSAF did not request the Monroe letters when they were not sent to her. Accordingly, the Monroe letters remained in the possession of ODOC Captain until late in the case. AUSAF also did not "maintain a log of all items obtained and reviewed and the disposition of each." Ex. 12 at 8.

C.    Recommendations for Taint Team Policy

In order to avoid similar problems in the future, the court is providing recommendations for future taint team procedures. First and foremost, the use of taint teams should be strictly limited to situations where they are necessary to avoid the accidental governmental review of privileged communications. If there is a feasible means to segregate privileged material without risk of accidental review and without use of a taint team, such means should be employed.

Secondly, because there is no nationwide policy on this matter contained in the Federal Criminal Discovery Blue Book, or elsewhere, the court is recommending that the U.S. Department of Justice develop national guidelines. Those guidelines should require a separation of the prosecution team from the filter team once the filter team has begun reviewing discovery.

PAGE 59 - AMENDED SUPERVISORY OPINION

Generally, the only communications from the filter team to the prosecution team should be the provision of filtered discovery to the prosecution team for production to the defense. Next, the guidelines should forbid the intentional review of any presumptively privileged materials. Included under the definition of "presumptively privileged" would be any private communication between a defendant and members of his or her current or former legal teams.

Throughout the evidentiary hearing in this case, the government appeared to take the position that while some of the communications that were intercepted were private communications between a defendant and his or her defense team, that did not mean they were legal or privileged in nature. *See, e.g.*, Tr. 119, 523, 527, 531, 548, 560, 703, 751, and 913. This court reviewed a significant number of those communications and they were clearly privileged. The only entity that is entitled to make a determination that a private communication between an attorney and her client is not privileged is the court. Because a motion to the court seeking to void the attorney-client privilege should be made on the basis of unprivileged material only, there is no reason to task filter teams with such motions.

The guidelines should also remind governmental attorneys that the use of a taint team does not exempt either filter attorney or prosecutor from complying with Rule 16 or *Brady*. Lastly, defense counsel should be provided with a copy of the filter protocol at the earliest possible opportunity, preferably before the protocol is employed and a copy should be filed with the court.

## III.    Oregon State Police and Detective Steele

During the course of this case, the court learned information of a troubling nature concerning OSP and Detective Steele. As a result, the court is recommending that the Oregon

Department of Justice and the Oregon Office of Public Defense Services consider taking action

to ensure that similar misconduct does not recur and that Detective Steele's prior conduct has not

resulted in a miscarriage of justice in other cases.

 With respect to OSP generally, it appears that OSP's personnel do not understand the

contours of the attorney-client privilege and that OSP maintains an unlawful policy concerning

the provision of penalty phase discovery in capital cases. First, a number of individuals at OSP

reviewed privileged communications and it does not appear they understood those

communications to be privileged or how such communications should be treated. Accordingly,

the court is recommending that OSP and the Oregon Department of Justice consider training OSP

personnel on the attorney-client privilege. Second, Detective Steele and Analyst 1 consistently

stated that it was OSP's policy not to turn over "penalty phase" discovery until late in a capital

case. The procedure outlined in Detective Steele's declaration is unlawful under any reasonable

interpretation of Oregon law. The moment a case is charged in Oregon as a capital case, a

sentence of death is a potential outcome and the State has an obligation to provide discovery

related to both guilt or innocence and punishment. There is no basis to delay the provision of

penalty phase discovery and the withholding of such discovery only serves to frustrate the ends of

justice. The court is recommending that the Oregon Department of Justice ensure that this policy

is discontinued and that OSP has provided complete penalty phase discovery in any pending

cases.

 With respect to Detective Steele, the court has learned that he backdated evidence reports,

obtained and reviewed privileged communications, destroyed *Brady* material, withheld evidence,

lied to the USAO, and filed a false declaration with this court. Given the breadth of his

PAGE 61 - AMENDED SUPERVISORY OPINION

misconduct in this case, it is not difficult to imagine that he has committed similar misconduct in other cases. The court is recommending that the Oregon Department of Justice and the Oregon Office of Public Defense Services consider conducting an audit of Detective Steele's recent cases to ensure that the results of those cases were based upon sound and complete evidence. Additionally, if the United States determines that it is appropriate to prosecute Detective Steele criminally for his conduct in this case, the court is recommending that any prosecution be handled by the U.S. Department of Justice rather than the USAO in order to avoid even the specter of a conflict of interest.

## CONCLUSION

As discussed above at length, the government mishandled this case badly. It failed to fulfill its discovery obligations and it interfered with defendants' attorney-client privilege. The most troubling aspect of the conduct in this case is that, in large part, the government, which was aware of the problems to a substantial degree, did not alert the court of these problems of its own volition. It is unclear when, if ever, the government would have raised these issues on its own. Rather, it was the accidental provision of privileged calls through discovery and the very hard work of defense counsel that ultimately resulted in the exposure of the conduct in this case.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

PAGE 62 - AMENDED SUPERVISORY OPINION

In addressing these problems, the court hopes that similar conduct will not recur.  Only through the stringent safeguarding of a criminal defendant's rights can the court ensure that justice is done.  An unhappy consequence of the many problems that surfaced in this case is that there has been a focus on the government's conduct rather than on the defendants' crimes and the horrific consequences of their actions.  This Supervisory Opinion now puts those issues to rest.

Dated this _____ day of August, 2014.

ANCER L. HAGGERTY
United States District Judge

PAGE 63 - AMENDED SUPERVISORY OPINION